**AMALGAMATED TRANSIT UNION, AFL–CIO, et al., Appellants,**

v.

**William BROCK, Secretary of Labor, et al.**

**No. 84–5623.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1986.

Decided Jan. 20, 1987.

As Amended Jan. 20, 1987.

---

Jeffrey Freund, with whom Earle W. Putnam, Laurence Gold, Washington, D.C., and Linda R. Hirshman, Chicago, Ill., were on the brief for appellants. Michael H. Gottesman, Washington, D.C., also entered an appearance for appellants.

John Oliver Burch, Asst. U.S. Atty., Washington, D.C., for appellee. Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Robert C. Seldon, Asst. U.S. Attys., and Nathaniel I. Spiller, Atty., Dept. of Labor, Washington, D.C., were on the brief for appellees.

Bruce M. Smith, Memphis, Tenn., was on the brief for amicus curiae, Memphis Area Transit Authority, urging affirmance.

R. Michael Lowenbaum, St. Louis, Mo., was on the brief for amicus curiae, Bi-State Development Agency of the Missouri-Illinois Metropolitan Dist., urging affirmance.

George M. Derryberry, Chattanooga, Tenn., was on the brief for amicus curiae, Chattanooga Area Regional Transit Authority, urging affirmance.

Before BORK and BUCKLEY, Circuit Judges, and OBERDORFER,* District Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

■ The Urban Mass Transportation Act of 1964 ("UMTA" or "the Act") authorizes the Secretary of Transportation to award federal funds to a formerly private, but presently publicly-owned, transit system only if the Secretary of Labor ("the Secretary") certifies that "fair and equitable arrangements" have been made "to protect the interests of employees affected by such assistance." 49 U.S.C. § 1609(c) (1982).[1] The issue presented here is whether section 13(c) permits the Secretary to issue a certification on the condition that such protective arrangements will be made at some date in the future. We hold that the case has not been rendered moot by the imposition of protective arrangements pending appeal, and that section 13(c) does not authorize the Secretary to issue certifications before protective arrangements have been made. We therefore reverse and remand to the district court for further proceedings.[2]

## I.

The UMTA was enacted in response to the "increasingly precarious financial condition of a number of private transportation companies across the country" whose collapse could leave communities without adequate mass transportation. *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union,* 457 U.S. 15, 17, 102 S.Ct. 2202, 2204, 72 L.Ed.2d 639 (1982). In an effort to assure that these communities would continue to have mass transportation services, the Act authorizes the Secretary of Transportation to award federal funds to local governments that have acquired privately owned transit companies. *See* 49 U.S.C. § 1602 (1982). Recognizing, however, that "public ownership might threaten existing collective-bargaining rights of unionized transit workers employed by private companies," *Jackson Transit Authority,* 457 U.S. at 17, 102 S.Ct. at 2204, Congress provided in section 13(c) that federal assistance may not be provided under the Act unless the Secretary of Labor certifies that "fair and equitable arrangements" have been made "to protect the interests of employees affected by such assistance." 49 U.S.C. § 1609(c); *see id.* § 1602(e)(4). Congress further provided in section 13(c) that these "protective arrangements shall include" provisions necessary to "the continuation of collective bargaining rights." *Id.* § 1609(c).

In response to this directive, the Secretary has promulgated guidelines governing the procedures for certification of proposed protective arrangements. *See* 29 C.F.R. Part 215 (1986). Under these guidelines, the Secretary of Transportation submits an application for federal assistance to the

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 202(a) (1982).

1. Section 13(c) provides in relevant part:

It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for ... (2) the continuation of collective bargaining rights.... The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

49 U.S.C. § 1609(c) (1982).

2. An issue raised on appeal, but not decided by the district court, is whether the Secretary may certify protective arrangements proposed by the Memphis Area Transit Authority, which do not provide for any type of a dispute mechanism, on the ground that all transit workers in Memphis are employees of a private management company and have the right to strike. *See* Brief for Appellees at 21–26. Because we cannot determine whether the challenged arrangements now include some dispute mechanism, and because resolution of this issue would require the submission of additional evidence and further briefing, we decline to decide it for the first time on appeal. We therefore remand this part of the case to the district court for further proceedings.

Secretary of Labor and requests a certification of the employee protective arrangements. *Id.* § 215.2. Upon receipt of the application, the Secretary of Labor notifies the parties of a time frame for the certification and the parties are expected to negotiate "expeditiously" and in "good faith." *Id.* § 215.3(d). If the negotiated protective arrangements do not satisfy the requirements of section 13(c), "the Secretary may grant parties additional time to negotiate a satisfactory arrangement, or he may set forth the provisions of the protective arrangement himself." *Id.* § 215.3(e). If the arrangements satisfy section 13(c), the Secretary certifies that fact to the Administrator of the Urban Mass Transportation Administration, United States Department of Transportation ("the Administrator"). *Id.* If the Secretary finds that the parties are unable to reach agreement, the Secretary may take "appropriate action," including a "determination of the terms and conditions upon which he will base his certification or his refusal to certify for specified reasons." *Id.*

Upon receipt of a certification, the Administrator prepares contracts for the disbursement of the funds and submits them to the transit authorities. The funds are normally available thirty days after the Administrator receives the signed contracts from the transit authorities. Defendants Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 4, Joint Appendix ("J.A.") at 77.

3. Appellants' original complaint challenged the applications of the three named transit authorities. Appellants subsequently filed several amendments to the complaint identifying other applications which the Secretary conditionally certified while the case was pending in the district court. *See* Exhibit A (as amended) to Complaint, J.A. at 47–48. Although these applications are before the court, for ease of discussion we will focus primarily on the specific circumstances of the applications of MATA, CARTA, and Bi-State.

4. An example of an interest arbitration provision is as follows:
   In the event of any labor dispute involving the Public Body and the employees covered

In this case, the Amalgamated Transit Union, AFL–CIO ("ATU"), and three of its affiliates, challenged the Secretary's certification of the labor protective arrangements in the applications of the Memphis Area Transit Authority ("MATA"), the Chattanooga Area Regional Transit Authority ("CARTA"), the Bi-State Development Agency of the Missouri-Illinois District ("Bi-State"), and several other transit authorities.[3]

Prior to the early 1970's, the jurisdictions covered by these transit authorities were served by private transit companies. *See* Complaint ¶¶ 14, 43, 63, J.A. at 11, 20–21, 26–27. When these companies came under public ownership, the local transit authorities applied for financial assistance under the UMTA. Before filing the applications, the transit authorities met with ATU and local bargaining representatives and negotiated agreements regarding section 13(c)'s requirement for labor protective arrangements ("section 13(c) agreements"). As part of these agreements, the unions and the transit authorities agreed to engage in binding, or "interest," arbitration at the request of either party to resolve a bargaining impasse. *See* Complaint ¶¶ 16, 45, 65, J.A. at 12–13, 21–22, 27–28.[4] The Secretary certified these arrangements as "fair and equitable" and the transit authorities thereafter received federal financial assistance. When the original section 13(c) agreements expired, the transit authorities submitted applications containing identical arrangements and those too were certified

by this agreement which cannot be [resolved] within thirty (30) days after such dispute first arises, such dispute may be submitted at the written request of either the Union or the Public Body to a board of arbitration selected in accordance with the existing collective bargaining agreement, if any, or if none, as hereinafter provided.... The term "labor dispute" shall be broadly construed and shall include but not be limited to, any controversy concerning ... the making or maintaining of collective bargaining agreements [and] the terms to be included in such agreements....
Affidavit of Earl W. Putnam ¶ 23, J.A. at 62–63.

by the Secretary. These agreements remained in effect until 1982.

Beginning in 1982, however, the transit authorities submitted applications in which they omitted from the protective arrangements any provision for interest arbitration. ATU opposed certification on the ground that the arrangements did not provide for any dispute mechanism in the event of a bargaining impasse and therefore did not satisfy the requirement of section 13(c) to include provisions necessary for "the continuation of collective bargaining rights." ATU argued that this requirement could be met only if there was some provision for a dispute mechanism to replace the employee's prior right to strike.

The Secretary agreed that some substitute for the right to strike was necessary to satisfy the requirements of section 13(c), but certified the arrangements "on the condition that ... [t]he parties shall negotiate in good faith over an alternative method for resolution of labor disputes." Attachment A to Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, J.A. at 104–05, 108–09.

ATU and the local affiliates then filed an action seeking a declaratory judgment that the Secretary did not have the authority to issue the conditional certifications and asking for an injunction against future conditional certifications and the disbursement of federal funds. The district court denied the unions' motion for preliminary injunction, *Amalgamated Transit Union v. Donovan*, 554 F.Supp. 589 (D.D.C.1982), and granted the Secretary's motion for summary judgment. *Amalgamated Transit Union v. Donovan*, C.A. No. 82–2922 (D.D.C. July 9, 1984), J.A. at 228–35. The court held that the Secretary did not abuse his discretion in conditionally certifying the arrangements because even in the absence of a provision for a dispute mechanism, the Secretary could determine that the "agreement as a whole was fair and equitable." Slip op. at 6, J.A. at 233. This appeal followed.

While the case was pending on appeal, this court issued a decision in *Amalgamat-*

*ed Transit Union v. Donovan*, 767 F.2d 939 (D.C.Cir.1985) (*Donovan*). In *Donovan*, the court rejected the reasoning employed by the district court in this case and held that a provision for the continuation of collective bargaining is a mandatory subject to any section 13(c) agreement:

> The Secretary is not free to certify a labor agreement that does not provide for the continuation of collective bargaining rights simply because he believes that, on balance, the agreement is fair. Rather, he must first determine that the requirements of the statute are fully satisfied *before* he can find an agreement "fair and equitable."

*Id.* at 946 (emphasis in original). The court then addressed the question of what was required by the Act's requirement for the continuation of collective bargaining rights:

> Section 13(c)'s requirement ... that labor protective agreements provide for "the continuation of collective bargaining rights" means, at a minimum, that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, "good faith" negotiations with their employer over wages, hours, and other terms and conditions of employment. Collective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects.

*Id.* at 951. Finally, the court addressed the question of whether the right to "meaningful" collective bargaining required a provision for binding interest arbitration. The court noted that section 13(c) did not require the continuation of the substantive provisions of a collective bargaining agreement, *id.* at 953, but concluded that meaningful collective bargaining could only be obtained if the union had some "economic weapon," comparable to private sector employees' right to strike. *Id.* at 954. The court held that "interest arbitration" was

not necessarily required by the Act and that "mandatory fact-finding with recommendations, preceded by 'good-faith' bargaining to a point of impasse," could satisfy the requirements of the Act. *Id.* at 955.

Following the holding in *Donovan* that all section 13(c) agreements must have some provision for a dispute mechanism, the Secretary reviewed new applications for federal funds from MATA, CARTA, Bi-State and other transit authorities. Because these applications also failed to provide for interest arbitration, or any other dispute mechanism, the Secretary again issued conditional certifications. These certifications required the parties to negotiate in good faith regarding a dispute mechanism but also provided that "if the parties have not reached agreement on an alternative method for the resolution of labor disputes, they will report the current status of their negotiations within 90 days of the date of [t]he certification." Motion of the Secretary to Govern Further Proceedings, Attachment A at 3, Attachment B at 3, Attachment C at 2, Attachment D at 3, J.A. at 238, 242, 244, 248.

When the ninety-day period expired, the Secretary sent letters to the transit authorities stating that the parties had to reach agreement on an alternative mechanism by a specific date. If the parties could not reach an agreement by two weeks prior to this date, they were to submit to the Secretary their final positions and the Secretary would then decide which dispute mechanism would be imposed. Appendix to Brief for Appellees, Attachments A–D.

At oral argument for this case, counsel for the Secretary informed the court that the Secretary had imposed a dispute mechanism for each of the certifications at issue in this case. Counsel also stated that the Secretary will continue to issue conditional certifications directing the parties to reach an agreement by a certain date.

## II.

The Secretary's sole argument on appeal is that this case is moot because all of the challenged section 13(c) agreements now have some dispute mechanism in place. Brief for Appellees at 14–21. Recognizing that the appellants represent transit employees from locations across the country, *see* Complaint ¶ 7, J.A. at 8–9, that applications for federal funds pursuant to the UMTA occur with some frequency (forty-five certifications of arrangements were issued while this case was pending in the district court), and that the arrangements under the Secretary's most recent condition will be in place within months of certification, *see* Appendix to Brief for Appellees, Attachments A–D, the Secretary nonetheless claims that the certifications are not short-term orders "capable of repetition, yet evading review," *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), because the conditions in the challenged certifications did not set a firm date for agreement and future certifications will do so. Further, although the Secretary intends to issue conditional certifications in the future, he believes that he has met the "heavy" burden of showing that "there is no reasonable expectation ... that the alleged violation will recur" and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted), because the Secretary will never again certify an agreement with the precise type of condition initially challenged in this case. Instead, the Secretary will add a condition directing the parties to reach an agreement by a certain date. We do not find merit in either of these arguments.

The issue presented in this appeal is whether the Secretary may certify arrangements as "fair and equitable" before those arrangements are included in a section 13(c) agreement. That question is not avoided merely because the Secretary may condition certification with a requirement that the parties reach agreement in a week, or in ninety days, or by some uncertain date. Changing the details of the condition still leaves the question whether the Secre-

tary has the authority to issue a certification upon any type of condition that involves the future rather than the present imposition of a protective arrangement. We will not permit a party to "suppose[ ] too narrow a formulation" of the issue presented to evade this court's review. *Environmental Defense Fund v. Gorsuch*, 713 F.2d 802, 811 (D.C.Cir.1983); *see also Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1198 (D.C.Cir.1985); *Valley Construction Co. v. Marsh*, 714 F.2d 26, 28 (5th Cir.1983).

### III.

■ We must determine whether section 13(c) authorizes the Secretary to issue certifications on the condition that an alternative dispute mechanism will be provided at a later date, and we must do so without the benefit of legal argument by the Secretary.[5] We conclude that the language and the legislative history of the statute, as interpreted by this court in *Donovan*, preclude the Secretary from issuing certifications before a provision for a dispute mechanism is in place, and that the Secretary has therefore exceeded his statutory authority.

Our power on review of an agency's interpretation of its statutory authority is well settled. First, we must employ standards of statutory construction to determine whether Congress has expressed a clear intent on the issue in question. If we find that Congress has clearly spoken, then our inquiry is at an end for "that intention is the law and must be given effect." *Chevron U.S.A. Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). If, however, no intent can be discerned, we must defer to a reasonable interpretation by the agency. *Id.* at 843–45, 104 S.Ct. at 2781–83.

In determining congressional intent, we begin with the language of the statute, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), and absent a "clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. G.T.E. Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Further, "[d]eference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.' " *United States v. Locke*, 471 U.S. 84, 95, 96, 105 S.Ct. 1785, 1792, 1793, 85 L.Ed.2d 64 (1985) (finding that the "phrase 'prior to' may be clumsy, but its meaning is clear").

In this case, we believe that the language of the statute strongly indicates that the Secretary is permitted to issue a certification only after the arrangements have been negotiated and are included in a section 13(c) agreement. Specifically, we rely on the following language in section 13(c):

1) "It shall be a condition of any assistance ... that fair and equitable arrangements *are* made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance."

---

**5.** The Secretary has not affirmatively argued the position that the statute authorizes it to issue conditional certifications. The sole reference to the Secretary's authority was made, in passing, in the course of his mootness argument:

> In the Secretary's view, [the original] certifications were premised upon correct legal assumptions, namely that the Act encourages local bargaining between the parties and does not mandate compulsory interest arbitration or specify any particular alternative dispute mechanism.... In retrospect, however, in the absence of a negotiated agreement over such a mechanism, it would have been prefer-

able had the Secretary imposed a strict deadline for the conclusion of negotiations or imposed his own resolution of the disputed item, instead of certifying on the basis of an open-ended condition to bargain in good faith.

Brief for Appellees at 16–17. This passage demonstrates that the Secretary asserts in this court the authority in question here, though the Secretary makes no substantive argument in support of that authority. This is most unsatisfactory. Because the case is not moot, the court is left to decide the issue without the assistance of real adversarial presentation.

2) "Such protective arrangements shall include ... such provisions as may be necessary for ... (2) the *continuation* of collective bargaining rights...."

3) *"The contract* for the granting of any such assistance *shall specify* the terms and conditions of the protective arrangement."

(Emphasis added.)

The "ordinary meaning" of the language in the first sentence appears to be that before a transit authority will be eligible for federal funds ("as a condition of"), the Secretary shall determine that "fair and equitable arrangements are made." In *Donovan,* this court held that one of the arrangements that must be made is a provision for a dispute mechanism. Accordingly, the Secretary must certify that a provision for a dispute mechanism *is* made. The statute does not, as the Secretary apparently would have argued, state that the disbursement of funds will be conditioned upon a finding by the Secretary that fair and equitable arrangements *will be* made in the future.

The meaning of the second sentence is that provisions must be made for the continuation (which would seem to mean "without interruption") of bargaining rights. The Secretary's argument might be that this requirement is met because collective bargaining rights will continue in the future when the dispute mechanism is in place. But the statutory language seems to rule out any hiatus between the time of certification and the time a dispute mechanism is in place. During this period, the transit authority will have use of federal funds, but collective bargaining rights will not "continue" because, as this court held in *Donovan,* collective bargaining rights do not exist in the absence of some dispute mechanism. During this hiatus, the employer is free to make a unilateral change and the union has no weapon to defend itself against this change. This is not a "continuation" of collective bargaining rights and thus is contrary to the language of the statute.

Finally, the clear import of the third sentence quoted above is dispositive with regard to congressional intent. It provides that "the contract" granting the funds "shall specify the terms and conditions of the protective arrangements." The contract can hardly specify terms and conditions that are as yet unknown. The only reasonable interpretation of this sentence is that the arrangements, *i.e.,* the dispute mechanism, must be in place prior to granting the funds because the contract must necessarily precede the disbursement of the funds. To accept the Secretary's position in this case, we would have to conclude that this language means that the contract must specify the "contingencies" imposed by the Secretary. But that is not what the statute says. Instead it states that the "terms and conditions *of the* protective arrangements" must be specified. A reading of the term "condition" as meaning "a contingency based upon a future event" does not make sense when inserted into this clause, particularly since the word is coupled with "terms." The only logical reading is that the protective arrangement must be in place and the contract must specify what that arrangement is. *See Jackson Transit Authority,* 457 U.S. at 23, 102 S.Ct. at 2207 ("Section 13(c) demands 'fair and equitable arrangements' as prerequisites for federal aid; it requires the approval of the Secretary of Labor for those arrangements; and it expressly incorporates *the protective arrangements* into the grant contract between the recipient and the Federal Government" (emphasis added) (footnote omitted).). Thus, the Secretary's position that he may certify arrangements at a point when no one knows what the terms and conditions of the arrangements will be cannot satisfy this clear directive.

Although we believe that the language of the statute disposes of this case, we also find that the legislative history of the Act provides no support for the Secretary's position and considerable support for our holding in this case. There is clear evidence that Congress intended the arrange-

ments to be in place prior to certification and prior to the distribution of federal funds. The House Report, after discussing the types of arrangements required by section 13(c), provides that "[t]he *arrangements thus made* would have to be *specifically* set forth in the contract granting the assistance." H.R.Rep. No. 204, 88th Cong., 1st Sess. 20 (1963), U.S.Code Cong. & Admin.News 1964, pp. 2569, 2589 (emphasis added). In the debates on the floor of the Senate, Senator Goldwater described section 13(c) as "a provision requiring as a *condition precedent* to the granting of any Federal assistance ... that arrangements be made ... to protect the interests of employees affected by such assistance or financing," 109 Cong.Rec. 5415 (1963) (emphasis added), and stated that it was his "understanding that prior to the obtaining of any loan or grant under the terms of [section 13(c)] all the provisions of [section 13(c)] must be met." *Id.* Senator Lausche interpreted section 13(c) to mean that "[a]s a *prerequisite* to the right to obtain money from the Federal Government, the Administrator would first have to make provision for the preservation of the rights, privileges, and benefits under existing collective bargaining agreements." *Id.* at 5416 (emphasis added). Finally, in the House of Representatives, Representative Griffin in arguing that the language "fair and equitable arrangements" was so broad as to threaten the emasculation of state labor law, stated his belief that under this language "the Secretary of Labor could apparently write anything into a collective bargaining agreement that he wants as a *condition precedent* to the granting of aid under this Act." 110 Cong.Rec. 14,978 (1964) (emphasis added).

In contrast, we find nothing in the legislative history to support the Secretary's position. The Secretary stated at oral argument in response to a question from the court that the legislative history supports his interpretation because it evinces a policy of encouraging negotiations between the parties rather than imposing a solution on them. While we agree that the purpose of section 13(c) was "[t]o prevent federal funds from being used to destroy the collective-bargaining rights of organized workers," *Jackson Transit Authority,* 457 U.S. at 17, 102 S.Ct. at 2204, and that Congress intended that the specific protections in section 13(c) agreements would be the product of negotiation, *see* H.R.Rep. No. 204, *supra,* at 16, U.S.Code Cong. & Admin.News 1964, at 2584 ("[s]ubject to the basic standards set forth in the bill, specific conditions for worker protection will normally be the product of local bargaining and negotiation"), we cannot determine how this supports the Secretary's position that it may certify arrangements before they exist. The policy of promoting negotiations is equally served, if not more so, by requiring parties to reach an agreement before the Secretary issues a certification. If a transit authority believes that the Secretary may impose a dispute mechanism more favorable than one which would be the product of bargaining, then it certainly will not have the same compulsion to negotiate that it would have if the funds are in peril.

Upon consideration of the language and legislative history of the Act, therefore, we conclude that the Secretary has exceeded his authority by issuing conditional certifications. The Secretary may certify arrangements only if some provision for a dispute mechanism is included in a section 13(c) agreement. We therefore reverse and remand to the district court for further proceedings with respect to MATA. *See supra* note 2.

*It is so ordered.*