UNITED TRANSPORTATION UNION, AFL–CIO, Appellant,

v.

William E. BROCK, Secretary of Labor.

No. 86–5439.

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1987.

Decided April 10, 1987.

William J. Birney, with whom William G. Mahoney, Washington, D.C., was on the brief for appellant.

Bette J. Briggs, Dept. of Labor, with whom Allen H. Feldman, Associate Sol. for Sp. Appellate and Supreme Court Litigation, and Steven J. Mandel, Counsel for Appellate Litigation, Dept. of Labor, Washington, D.C., were on the brief for appellee.

Before BORK, SILBERMAN and FRIEDMAN *, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

The Urban Mass Transportation Act of 1964 ("UMTA" or "the Act") authorizes the Secretary of Transportation to award federal funds to local governments that have acquired privately owned transit companies only if the Secretary of Labor certifies that "fair and equitable arrangements" have been made "to protect the interests of employees affected by such assistance." 49 U.S.C. § 1609(c) (1982).[1] These protective arrangements must include "provisions as may be necessary for ... the continuation of collective bargaining rights." *Id.* The issue in this appeal is whether that provision entitles transit employees to a reinstatement of collective bargaining rights lost for reasons wholly unrelated to the Act seven years before the public transit authority applied for federal assistance. We conclude that it does not and, therefore, affirm.

## I.

Appellant, United Transportation Union ("UTU" or "the union") challenges the Secretary of Labor's decision to certify the protective arrangements in the application for federal assistance of the Greenville Transit Authority ("GTA" or "the transit authority").[2] UTU argues that the protective arrangements cannot be certified pursuant to section 13(c) because they do not provide for the continuation of collective bargaining rights.

Prior to public acquisition, bus service in Greenville, South Carolina was provided by Greenville City Coach Lines, Inc. ("CCL"). During this period, CCL recognized UTU as the bargaining representative of its bus operators and garage employees and entered into two collective bargaining agreements with UTU. Each agreement provided that if CCL could not earn a reasonable rate of return on its bus service, it could "serve notice of discontinuance of service and declare [the] contract null and void." Joint Appendix ("J.A.") at 41, 57–58.

On October 29, 1975, CCL notified the City of Greenville that it was forced to discontinue service because the transit operation had not been profitable and there was no prospect that it would be profitable in the future. J.A. at 152–53. In response, the City notified CCL that discontinuance of service would be a forfeiture or abandonment of CCL's franchise obligations to the City, *id.* at 154, adopted a resolution refusing to consent to any discontinuance of service, *id.* at 155, and thereafter brought suit in state court for breach of the franchise agreement. *See id.* at 156. On November 30, 1975, CCL discontinued its bus service.

On December 1, 1975, GTA began providing limited "peak hour" bus service by using old school buses for the service. Subsequently, GTA hired several former employees of CCL, but did not acquire any of CCL's assets. GTA provided bus service without federal assistance from 1975 to 1982.

In 1982, seven years after it assumed the transit operation, GTA applied for federal assistance under the UMTA. The UTU then notified the City that a majority of GTA's employees had signed authorization

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

1. The UMTA was enacted in response to the threat that communities would be left without adequate mass transportation as a result of the financial failure of private transit companies. *See* Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, 457 U.S. 15, 17, 102 S.Ct. 2202, 2204, 72 L.Ed.2d 639 (1982). One purpose of the Act was to assist local communities in acquiring failing private transit companies. *Id.* Section 13(c) was added because of the recognition that "public ownership might threaten existing collective-bargaining rights of unionized transit workers employed by private companies." *Id.*

2. GTA is a public entity created by the City of Greenville and Greenville County, South Carolina, pursuant to the Regional Transportation Authority Law, S.C. Code Ann. § 58–25–10 *et seq.* (Law.Co-op.1976).

cards selecting UTU as their exclusive bargaining representative and requested recognition by the City. J.A. at 158. GTA refused to recognize UTU as the bargaining representative of the transit employees on the ground that it was a public entity and thus outside the jurisdiction of the National Labor Relations Act[3] and because it was prohibited under state law from recognizing or bargaining with the union. *Id.* at 86.

Upon receipt of GTA's applications for federal assistance, the Secretary of Labor requested information from the union and the transit authority regarding the transit employees' collective bargaining rights. In response, the union argued that it was entitled to an opportunity to negotiate with GTA over the protective arrangements to be included in the grant contract because it continued to represent GTA's employees. *See* J.A. at 187.

On June 30, 1982, the Secretary of Labor certified the protective arrangements and concluded that GTA had no obligation to negotiate with UTU over the protective arrangements because the loss of the transit employees' collective bargaining rights was "a result of CCL's termination of service due to economic reasons" and had no "factual nexus" to the pending application for federal assistance. J.A. at 89. In January 1983 the Secretary again certified a GTA application for assistance without requiring a provision for the continuation of collective bargaining rights.[4]

On March 8, 1983, UTU filed suit in the district court seeking to enjoin the Secretary from certifying future GTA applications which do not contain a provision for the continuation of collective bargaining rights and to rescind prior certifications of GTA's applications. The district court concluded that the Secretary did not act arbitrarily or capriciously in certifying the arrangements because "federal funds were not used to adversely affect the collective bargaining rights of any transit workers in the City of Greenville" and dismissed the case. *United Transportation Union, AFL–CIO v. Donovan*, No. 83–0665 (D.D.C. Apr. 17, 1986), J.A. at 228–29.

## II.

On appeal UTU argues that section 13(c) requires a provision for the continuation of collective bargaining rights whenever transit employees enjoyed collective bargaining rights prior to public acquisition. Brief of Appellant at 13. The Secretary's position is that section 13(c) requires a provision for the continuation of collective bargaining rights only when there is some causal relationship between federal assistance, public acquisition, and the consequent loss of collective bargaining rights. Brief for the Secretary of Labor at 12–14. In other words, the Secretary argues that the loss of collective bargaining rights must occur "as a result of" the federal assistance.

 Section 13(c) provides that the Secretary must certify that "fair and equitable arrangements are made ... to protect the *interests of employees affected by such assistance*" and that the protective arrangements must include "provisions as may be necessary for ... the *continuation* of collective bargaining rights." The plain import of the first quoted phrase is that the only interests protected by section 13(c) are those affected by the financial assistance sought. As we recently stated, the ordinary meaning of the term "continuation" in the second quoted phrase would seem to be "without interruption." *See Amalgamated Transit Union, AFL–CIO v. Brock*, 809 F.2d 909, 916 (D.C.Cir.1987). Thus, the intent of Congress, as expressed in the clear language of section 13(c), is that a provision pursuant to this subsection is required only when the transit employees had collective bargaining rights that could be affected by the federal assistance. It is these rights that must be "continued" be-

---

**3.** *See* 29 U.S.C. § 152(2) (1982) ("[T]he term 'employer' ... shall not include ... any State or political subdivision thereof.").

**4.** The Secretary conditioned these certifications upon the inclusion of other protective arrangements in the grant contract. J.A. at 189. These include a provision for the preservation and continuation of "[a]ll rights, privileges, and benefits ... of employees," and for the protection of employees "placed in a worse position ... as a result of the [federal assistance]." *Id.* at 190.

fore assistance will be awarded to the public transit authority.

In this action the transit employees did not have any collective bargaining rights that could be affected by the grant of federal assistance. Those rights were lost seven years before GTA applied for federal assistance as a result of CCL's discontinuance of service. The loss was wholly unrelated to the UMTA and, therefore, was not then, and could not have been, "affected" by federal assistance. Thus, at the time GTA applied for federal assistance, there were no rights to be protected or continued and appellant's argument fails under the plain language of the statute.

The legislative history supports this reading of the statute's text. The House Report explains that section 13(c) was included in the Act because of the belief "that all workers *adversely affected by adjustments effected under the* [Act] should be fully protected in a fair and equitable manner, and that *Federal funds should not be used* in a manner that is directly or indirectly detrimental to legitimate interests and rights of such workers." H.R.Rep. No. 204, 88th Cong., 1st Sess. 16 (1963), U.S.Code Cong. & Admin. News 1964, pp. 2569, 2584 (emphasis added).

Senator Morse, a sponsor of the amendment which resulted in the final language "continuation of collective bargaining rights," stated a similar intent:

> The question of policy is this: Should the Federal Government make available to cities, States and local governmental units Federal money to be used to strengthen their mass transit system ... when *the use of that money would result in lessening the collective bargaining rights of existing unions?*
>
> [W]e cannot justify ... the use of Federal dollars ... *the expenditure of which would result in worsening the present collective bargaining rights* of free labor which operates that transit system.

109 Cong.Rec. 5671 (1963) (emphasis added); *see also* 110 Cong.Rec. 15,454 (1964) (Section 13(c) provides "assurances that changes of the kind that are projected by this bill will not be carried out at the expense of a stable and dedicated work force which has served the public interest for so long a period of time."). It can hardly be disputed that these statements evince a clear congressional intent to protect only those rights which existed and would be affected by the federal assistance.

Senator Morse also noted that organized labor had pressed for a broader provision which would have required collective bargaining rights whenever a new public transit authority was established with federal assistance, and stated his objections to such a provision:

> In my judgment, the only sound policy to which [organized labor is] entitled is the maintenance of the status quo. If you have collective bargaining now, I think the bill ought to be so drawn that you will be assured of a continuance of collective bargaining, so far as the Federal Government is concerned.

109 Cong.Rec. 5672 (1963). Thus the contention that a public transit authority must grant collective bargaining rights whenever it receives federal assistance was considered and rejected by Congress and appellant's claim that federal assistance creates collective bargaining rights also fails upon a review of the legislative history. The judgment of the district court is, therefore,

*Affirmed.*