LOCAL 1235, AMALGAMATED
TRANSIT UNION, AFL-CIO,
Plaintiff-Appellant,

v.

METROPOLITAN TRANSIT AUTHORI-
TY, ATE Management Services, Inc.
and Transportation Management of
Tennessee, Inc., Defendants-Appellees.

Supreme Court of Tennessee,
at Nashville.

March 26, 1990.

Richard C. Lowe, Howard M. Kastrinsky,
King & Ballow, Nashville, for defendants-
appellees.

Douglas Taylor, Gromfine and Taylor,
P.C., Washington, D.C., Cecil Branstetter,
Branstetter, Kilgore, Stranch & Jennings,
Nashville, Earl Putnam, Gen. Counsel,
Amalgamated Transit Union, AFL-CIO,
Washington, D.C., for plaintiff-appellant.

OPINION

HARBISON, Justice.

On behalf of employees of a publicly-
owned transit system in Nashville, a labor
union brought this action against the em-
ployer seeking injunctive and declaratory
relief. The chancellor granted a temporary
injunction. On interlocutory appeal pursu-
ant to Rule 9, T.R.A.P. the Court of Ap-
peals ordered the injunction dissolved and
remanded the case for further proceedings.
We disagree with some of the conclusions
reached by the intermediate court. Its
judgment is modified and the cause is re-
manded to the trial court for the taking of
such further proof as may be appropriate
and for final disposition.

A. *The Factual Background*

Congress enacted the Urban Mass Trans-
portation Act of 1964 ("UMTA"), 49 U.S.C.
App. §§ 1601–1617, authorizing grants to
assist local governments in acquiring and
operating troubled public transportation
systems. The grant programs are adminis-

tered through the Department of Transportation with cooperation of the Department of Labor.

Prior to 1973 the public transit system in Nashville had been privately owned and operated through agreements with the Nashville Transit Authority. That authority continued to exist and function as an agency of the Metropolitan Government after consolidation of the city and county governments. In 1973 the Metropolitan Government, through its transit authority, applied to the Department of Transportation and received a grant to enable it to purchase the local transit company. The Metropolitan Transit Authority ("MTA") owns the system, but it contracted for operation of the system with a management company, ATE Management Services, Inc. ("ATE"). Transportation Management of Tennessee, Inc. ("TMT") is a wholly owned subsidiary of ATE Management Services, Inc. The parent and subsidiary together manage and operate the public transit system in Nashville.

For many years the appellant union has been the collective bargaining agent for employees of the transit system. It continued in that capacity after acquisition of the system by the Metropolitan Government. Since 1940 the union and the employer have entered into a series of collective bargaining agreements covering wages, hours and conditions of employment. These collective bargaining agreements are normally negotiated for a three year period. Since 1973 the agreements have been executed by TMT on behalf of the employer.

Section 13(c) of the UMTA, 49 U.S.C.App. § 1609(c) provides:

It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance.

In order to meet this condition the Metropolitan Government entered into an agreement with the plaintiff union on April 6, 1973, referred to as a "section 13(c) agreement", to provide protective arrangements for the employees. The agreement was approved by the Secretary of Labor and the grant duly authorized.

Thereafter in 1975 a substantial additional grant was sought by the MTA, and a second section 13(c) agreement was executed between it and the union.

Both of these agreements contained an "interest arbitration" provision as well as a binding grievance arbitration provision.

The United States Supreme Court has stated that "interest arbitration"

... relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894 (1945).

The "interest arbitration" clauses in the 1973 and 1975 agreements were included in the definition of the term "labor dispute" with the provision that that term should include "the making or maintaining of collective bargaining agreements [and] the terms to be included in such agreements ..."

After the 1975 grant, two additional grants were sought by the MTA in 1980. One of these was for the purchase of vehicles and the other for the construction of a mall, or shelters for patrons of the system, along Deaderick Street. Separate section 13(c) agreements were not executed in connection with these two grant applications, but the terms and provisions of the 1975 agreement were expressly incorporated into the applications, and the grants were approved on those conditions. The grant for the mall was still shown by MTA as "open" when this litigation began.

Commencing in 1979 the MTA and TMT notified the United States Department of

Labor that they no longer agreed to interest arbitration provisions, contending that such provisions were not necessary as a part of a labor protective arrangement under section 13(c) because transit employees were privately employed and had a right to strike, the latter being an adequate dispute resolution procedure under the National Labor Relations Act. The union has never acquiesced in that contention of the employer, and the issue has been the subject of controversy for the past decade.

None of the triennial collective bargaining agreements between the union and the employer contained interest arbitration provisions, although they did contain provisions for arbitration of grievances. In 1979 the parties negotiated for a new collective bargaining agreement. Their negotiations reached an impasse and the union demanded interest arbitration. The employer refused, and litigation followed in the federal courts. The position of the union was sustained and arbitration was ordered in *Division 1235, Amalgamated Transit Union v. Metropolitan Transit Authority*, 477 F.Supp. 1027 (M.D.Tenn. 1979), aff'd. 650 F.2d 1389 (6th Cir.1981). Subsequently, however, the United States Supreme Court ruled that the proper forum for litigation over breach of a section 13(c) agreement was the state courts and that the federal courts did not have jurisdiction over suits brought by unions against local governmental entities to enforce such agreements. *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union*, 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982).

Under the UMTA two types of grants are made to local governments, one for capital improvements and the other for current operations. After the first four grants sought by the MTA, accompanied by section 13(c) agreements with interest arbitration provisions, nine other grants were applied for and approved, although one of these was never funded. In each instance the union insisted that interest arbitration was necessary, but the Secretary of Labor

conditionally approved the grants with the requirement that the parties negotiate an appropriate protective arrangement. Apparently this practice was followed nationwide, but when it was challenged the Court of Appeals for the District of Columbia held that the Secretary did not have statutory authority to approve a grant conditionally or prior to the incorporation of an appropriate protective arrangement. *Amalgamated Transit Union v. Brock*, 809 F.2d 909 (D.C.Cir.1987).

After receiving extensive information from the parties to the present litigation and after the parties were unable to agree on the issue of interest arbitration, the Secretary of Labor on April 15, 1986 used the power of that office to prescribe conditions for certification of grants under the UMTA when the parties have been unable to agree. The Department of Labor concluded that TMT was an employer subject to the National Labor Relations Act and that its employees were private sector employees with the right to strike. The Secretary recognized that this determination ultimately would have to be made by the National Labor Relations Board ("NLRB"). Insofar as the present record reveals, that determination has never been made. The Secretary directed modification of the 1975 section 13(c) agreement between the parties to delete the interest arbitration provision, and this modification was made applicable to all certifications made on or after February 9, 1983. The Secretary stated that the decision would be reconsidered should the NLRB determine that the employees of the transit system did not have a right to strike.

The present state court litigation resulted from inability of the union and the employer to agree upon a new collective bargaining agreement to replace one which was to expire on May 11, 1985. That agreement was extended until June 30, 1985, but throughout the remainder of that year and in the early part of 1986 the parties were not able to reach a new agreement. On February 5, 1986, the union de-

manded interest arbitration concerning the terms of a new collective bargaining agreement. The employer declined to participate in interest arbitration and notified the union that it intended to discontinue dues check-off if a new agreement was not reached within a short time.

## B. *The Present Litigation*

On April 3, 1986, the union filed the present state court action seeking to enforce the dues check-off provisions of the recently expired collective bargaining agreement and also to obtain equitable, declaratory and injunctive relief under the section 13(c) agreements of 1973 and 1975. Among other things it sought an injunction to require interest arbitration of a new collective bargaining agreement pursuant to the section 13(c) agreements and pursuant to certain state statutes dealing with public transit authorities which had been enacted in order to enable Tennessee municipalities to take advantage of the Urban Mass Transportation Act of 1964. T.C.A. §§ 7–56–101—109.

The chancellor held a hearing on the application for temporary injunction on April 11, 1986. The parties filed extensive affidavits and exhibits, but there was no other testimony from witnesses, either by deposition or on oral testimony. Nor were any formal stipulations of fact entered into by the parties. At the time of the hearing the defendants had not filed answers or other responsive pleadings. At the hearing the defendants denied state court jurisdiction, insisting that the employees of TMT were private sector employees and that proper jurisdiction lay with the NLRB. In addition they contended that the 1973 and 1975 section 13(c) agreements, with their interest arbitration provisions, were no longer in force and denied that TMT was a party to any such agreement.

The chancellor concluded that state court jurisdiction was appropriate and that the section 13(c) agreements between the union and MTA were binding upon the management company, TMT. The chancellor found as a fact that the 1973 agreement under section 13(c) was still in force and effect. He stated:

Section 11 of the 1973 Agreement defines "project":

(11) The term "Project", as used in this agreement shall not be limited to the particular part or facility of the transit system assisted by federal funds, but shall include any part or facility of the transit system which is affected by such assistance. The phrase "as a result of the project" shall, when used in this agreement, include events occurring in anticipation of, during, and subsequent to the Project.

The chancellor found that the "project" for which the federal funds were granted in 1973

is still open. The monetary grant was for the purchase of the company, buses and construction of facilities. Clearly the transit system is still vitally "affected by such assistance." Therefore, the contract is still in effect. The 13(c) Agreement containing interest arbitration is still a valid agreement and both the Union and TMT must abide by its terms.

The chancellor concluded that the union had shown a sufficient likelihood of success in the litigation to warrant a temporary injunction, mandating continuation of dues check-off and interest arbitration.

The chancellor's memorandum was filed on April 17, 1986, and a decree consistent with the memorandum was entered on April 28.

Thereafter nearly four months elapsed, during which responsive pleadings were filed, issues joined, the attorney general notified of an attack upon the constitutionality of the Tennessee statutes, and motions for summary judgment with affidavits filed by the respective parties. No decision was made on any of the subsequent pleadings and motions. The case was never tried. No final judgment was ever entered. Instead, on August 25, 1986,

a decree was entered granting an interlocutory appeal pursuant to Rule 9, T.R.A.P., staying the interest arbitration order and otherwise preserving the status quo between the parties. The Court of Appeals accepted the interlocutory appeal with the case in this posture. The only order from which the appeal could have been taken was that of April 28, 1986.

### C. *Decision of the Court of Appeals*

The Court of Appeals upheld the decision of the chancellor that the employer and the other defendants in this case were subject to state court jurisdiction, were bound by the section 13(c) agreements and that the state court was a proper forum for enforcing the section 13(c) agreements if the latter were still in force.

The Court of Appeals found, however, that the action of the Secretary of Labor on April 15, 1986, which occurred four days after the injunction hearing in the present case, effectively deleted the interest arbitration provisions from the contracts between the parties. The Court of Appeals further found that the contracts were ambiguous as to their terms and duration and that it was the intention of the parties that each of the section 13(c) agreements should supersede the others, so that the 1973 and 1975 interest arbitration clauses were superseded and no longer in effect. The Court of Appeals accordingly found that the chancellor had erred in granting a temporary injunction. It remanded the case for further proceedings.

### D. *Our Conclusions*

■ We respectfully disagree with the Court of Appeals in several respects. The evidentiary record is not sufficiently developed to make a factual determination as to whether many of the projects funded under section 13(c) agreements containing interest arbitration are or are not still "open" or affecting the interests of employees. The chancellor found that the initial project funded in 1973 was still "open". There is

no evidence from a factual standpoint from which we can conclude that this decision was erroneous. We do not agree with the Court of Appeals that the parties necessarily intended that each of the successive 13(c) agreements should supersede the preceding ones or that such was necessarily the legal effect thereof. The evidentiary record on this subject is not sufficiently developed to determine those issues.

There is an affidavit from the general manager of TMT that several of the grant projects were "closed" but there is no evidence that the various projects do not still affect the interests of employees. As stated by the Court of Appeals for the District of Columbia, "the only interests protected by section 13(c) are those affected by the financial assistance sought." *United Transportation Union v. Brock*, 815 F.2d 1562, 1564 (D.C.Cir.1987).

None of the parties had contended, prior to the appeal, that the agreements were ambiguous or uncertain in meaning or that there was any doubt as to the intention of the parties. If issues of this sort are to be raised, they must be litigated and proper evidence adduced. Each of the projects was funded separately, and a separate section 13(c) agreement was required in connection with each. We cannot say on this record that the parties intended that subsequent agreements would supersede earlier ones. The degree and extent to which the different projects may have affected the interests of employees or whether any such effect has now been so diluted by the passage of time that a particular project should no longer be considered in effect are factual matters which have not been developed by evidence. There is logic in the conclusion of the Court of Appeals that only a single protective arrangement should exist at a given time. Yet in one year there were five separate grant applications filed by MTA and in several other years there were two. Most of the grants were for capital assets, and at least one project, the Deaderick Street Mall, was conceded by the employer to be still "open" on its books when the temporary injunction was issued. The grant for that project was

**916**

made in 1980 under an interest arbitration agreement.

There is a question as to whether the Secretary of Labor has authority to delete retroactively interest arbitration provisions from previously approved grant projects. That development had not occurred at the time of the hearing before the chancellor on April 11, 1986. It is an issue which needs to be further briefed and explored. The April 15, 1986 letter from the Secretary was not filed in this record until June 22, long after the temporary injunction was issued. As previously stated, the Secretary of Labor has already been determined by the courts to be in error in conditionally approving grants without adequate protective arrangements, and the authority of that office retroactively to delete provisions from grants which have already been approved and expended was not one of the issues presented to the chancellor or developed in the trial court.

In our opinion an interlocutory appeal was inappropriate in this case except to stay interest arbitration until the case had been fully heard in the trial court. We are of the opinion that the chancellor probably should not have ordered the parties to engage in interest arbitration prior to the trial of the case on the merits and the issuance of a permanent injunction.

Accordingly the judgment of the Court of Appeals is vacated. This cause is remanded to the trial court for the entry of a final judgment either granting or denying a permanent injunction. We understand that the dues check-off issue has become moot by the passage of time. In our opinion the interest arbitration issue should be stayed until the entry of a final judgment in this case.

Costs incident to the appeal of this matter are taxed one-half to the appellant and one-half to appellees. All other costs will be fixed by the chancellor.

DROWOTA, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.