David A. CLARKE, et al., Appellees,

v.

UNITED STATES of America,
Appellant.

No. 88–5439.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 30, 1990.

Decided Oct. 2, 1990.

Alfred Mollin, Atty., with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Michael Jay Singer and Jacob M. Lewis, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellant. John C. Harrison, Washington, D.C., also entered an appearance for appellant.

I. Michael Greenberger, with whom Gregory E. Mize, James R. Bird, and Richard M. Wyner, Washington, D.C. were on the brief, for appellees.

Before WALD, Chief Judge, MIKVA, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Concurring opinion filed by Circuit Judge BUCKLEY, in which Circuit Judge D.H. GINSBURG joins.

Dissenting opinion filed by Circuit Judge EDWARDS, in which Circuit Judges MIKVA and RUTH·BADER GINSBURG and Senior Circuit Judge ROBINSON join.

STEPHEN F. WILLIAMS, Circuit Judge:

In *Gay Rights Coalition v. Georgetown University*, 536 A.2d 1, 39 (D.C.1987), the District of Columbia Court of Appeals held that the University's refusal to grant the Coalition "equal access to its 'facilities and services'" violated the District's Human Rights Act. Congress responded with § 145 of the D.C. Appropriations Act of 1989, known in this litigation and in the media as the "Armstrong Amendment" after its prime mover in the Senate. Pub.L. No. 100–462, § 145, 102 Stat. 2269, 2269–14 (1988). Section 145(b) provided: "None of the funds appropriated by this Act shall be obligated or expended after December 31, 1988, if on that date the District of Columbia has not adopted subsection (c) of this section." Subsection (c)—the language specified for addition to the D.C.Code—in turn read: "[I]t shall not be an unlawful discriminatory practice in the District of Columbia for any educational institution that is affiliated with a religious organization or closely associated with the tenets of a religious organization to deny, restrict, abridge, or condition ... the use of any fund, service, facility, or benefit; or the granting of any endorsement, approval, or recognition, to any person or persons that are organized for, or engaged in, promoting, encouraging, or condoning any homosexual act, lifestyle, orientation, or belief."

Instead of enacting the language, the members of the D.C. Council sued for injunctive and declaratory relief against enforcement of the funding condition. The district court found that the condition violated their First Amendment rights by coercing them to speak against their wills, and issued a declaratory judgment. *Clarke v. United States*, 705 F.Supp. 605 (D.D.C.1988). Having given plaintiffs relief on that claim, the court did not reach their other theories. The government appealed, and a panel of this circuit upheld the district court on September 26, 1989. *Clarke v. United States*, 886 F.2d 404 (D.C. Cir.1989).

Although the 1989 Appropriations Act was due to expire September 30, 1989, four days after the panel decision, the Act was extended several times as the 1990 Appropriations Act wound its way through Congress. The last extension expired on November 20, 1989, Pub.L. No. 101–154, 103 Stat. 934 (1989), and the 1990 Act became law when the President signed it the next day. Congressional Index, 101st Cong. (1989–90) (CCH) at 35,050 (H.R. 3746). The new act did not contain a funding condition; instead, Congress used its power under the District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, § 601, 87 Stat. 774 (1973), to amend the D.C.Code directly, bypassing the D.C. Council. District of Columbia Appropriations Act, 1990, Pub.L. No. 101–168, § 141, 103 Stat. 1267, 1284 (1989).

In the meantime, the United States had filed a petition for rehearing and suggestion for rehearing *en banc*. Once the last extension expired and the 1990 Act became law, it filed a motion suggesting that the case was moot and that the panel decision be vacated. On December 15, 1989, both the panel and the full court declined to rehear the case on the merits, but withheld the mandate. *Clarke v. United States*, 898 F.2d 161 (D.C.Cir.1989). The panel denied the proposed vacatur for mootness, but the full court ordered the mootness issue heard *en banc*.

We now decide that the issue was moot after the expiration of the last extension of the 1989 Act, and that the proper remedy is vacatur of the panel opinion and a remand to the district court with instructions to vacate its opinion and to dismiss the relevant count of the complaint as moot.

### I. *Mootness*

A. Without regard to the doctrine's exceptions.

■ The mootness doctrine, deriving from Article III, limits federal courts to

deciding "actual, ongoing controversies." *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 600–01, 98 L.Ed.2d 686 (1988). Even where litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 575 (D.C.Cir.1990); see also *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). This limitation "subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Continental Bank Corp.,* —— U.S. ——, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990).

Appellees do not claim that the Armstrong Amendment has had any residual effect on their First Amendment rights since it was superseded by the 1990 Appropriations Act. The 1989 Act appropriated funds "for the District of Columbia for the fiscal year ending September 30, 1989," Pub.L. No. 100–462, 102 Stat. at 2269, and § 108 of the 1989 Act pinned down its automatic expiration with an explicit statement that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." [1] Pub.L. No. 100–462, § 108, 102 Stat. at 2269–8. After the 1989 Act's last extension expired, the Armstrong Amendment's funding condition ceased to have any effect.

Appellees argue, however, that the case is not moot because vacating the district court's declaratory judgment would leave open the "formal possibility of prosecution" under the Anti–Deficiency Act, which forbids "knowingly and willfully" expending government funds without authorization from Congress. Brief for Appellees at

39–40; see 31 U.S.C. §§ 1341(a), 1342 & 1350 (1988). They rely primarily on *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), in which the Court found that the possibility of "civil and criminal liability" saved the case from mootness. *Id.* at 630, 102 S.Ct. at 2634. The plaintiff corporation had made a tender offer in disregard of Illinois's anti-takeover law and secured an injunction against the law's enforcement, but it later withdrew the offer. The Secretary of State of Illinois, who was charged with enforcing the Illinois act, had represented to the court of appeals that he "intend[ed] to enforce the Act against MITE." *Id.*

Here, by contrast, there is no such threat. Quite the opposite: the government at oral argument not only stated that "no one has ever suggested that there would be [a prosecution]," but also conceded "formally for the record that the existence of a judgment during that time would be a complete and adequate defense to any prosecution."

The concession gives formality to the obvious—the nonviability of any such prosecution. Our research has failed to turn up a single prosecution under the Anti–Deficiency Act in its entire existence since 1905. 33 Stat. 1214, 1257–58, ch. 1484, § 4 (1905). Moreover, the appellees would have at least two strong legal arguments should some future prosecutor try to dust it off. First, the district court's decision (and the panel affirmance) would raise a serious question whether appellees had the state of mind necessary for a violation. Second, although the *MITE* majority declined to resolve whether a later-vacated *federal* injunction would protect MITE from a *state* prosecution, 457 U.S. at 630, 102 S.Ct. at 2634, and Justice Stevens concluded that it could not, *id.* at 647–54, 102 S.Ct. at 2643–47, no federalism concerns would prevent an immunizing effect in the present case.[2]

---

1. Appellees have not pointed to any funds covered by § 108's reference to express exceptions that remained unexpended at the time the 1990 Act became law; it seems probable that if any existed the 1990 Act superseded the authority of the 1989 one.

2. Justices Marshall and Brennan concluded that the case was moot, because the federal decision would defeat any attempted state prosecution. *Id.* at 655–64, 102 S.Ct. at 2647–52 (Marshall, J., dissenting). While they stated that federal courts had the power to issue a more limited injunction, one "subject to the condition that if

Indeed, the few circuits faced with the question have held that a federal judgment, later reversed or found erroneous, is a defense to a federal prosecution for acts committed while the judgment was in effect. Thus in *United States v. Mancuso,* 139 F.2d 90 (3rd Cir.1943), the court held that a draftee who did not report for duty because a district court had enjoined enforcement of his induction order could not be prosecuted for failing to appear—despite the injunction's having been issued erroneously. And in *United States v. Albertini,* 830 F.2d 985 (9th Cir.1987), the court reversed a criminal conviction for acts taken in conformity with a decision of its own that was later reversed by the Supreme Court. See also *United States v. Brady,* 710 F.Supp. 290 (D.Colo.1989); compare *United States v. Bruscantini,* 761 F.2d 640, 641–42 (11th Cir.1985) (rejecting argument that reliance on stated opinion of state judge and state prosecutor was a defense to federal charge).

Of course we cannot say that the risk of an attempted prosecution is zero. Later government representatives might try to persuade a court to distinguish *Mancuso* or to reject it. They might also believe that the government's present representation created no estoppel, and conceivably a court would agree. But see 1B Moore's Federal Practice ¶ 0.405[8] at 239–40 (1988); *Farmland Indus., Inc. v. Grain Bd. of Iraq,* 904 F.2d 732, 739 (D.C.Cir.1990). But zero risk is not the test. Any assessment of the possible side effects of a case "really should be painted in shades of gray, since few controversies are wholly beyond the power of changed circumstances to revive." *Commodity Futures Trading Comm'n v. Bd. of Trade,* 701 F.2d 653, 655 (7th Cir. 1983); see also Wright, Miller & Cooper, *Federal Practice and Procedure* § 3533.3

at 273–74 (1984) (framing issue as whether "the prospect of future effects is too remote to justify decision"); compare *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302, 99 S.Ct. 2301, 2310–11, 60 L.Ed.2d 895 (1979) (pre-enforcement review of allegedly unconstitutional statute is allowable when "fear of criminal prosecution ... is not imaginary or wholly speculative"). The government's formal representation, and its stipulation as to the exonerating effect of the district court judgment, seem to us enough to overcome the "formal"—and realistically quite remote—possibility of prosecution.

While an explicit assertion of intent to prosecute can preserve a conflict's vitality, see *MITE,* and the risk may be great enough where the record on intent to prosecute is a blank, *Charles v. Daley,* 749 F.2d 452, 457 (7th Cir.1984) (amendment of criminal statute does not render challenge moot where defendants "offered no evidence to rebut [the] possibility of prosecution" for violations committed while deleted language was in effect),[3] we have found no case where a court has found that the possibility of prosecution kept a controversy alive in the face of the government's formal legal concession of the existence of a complete defense. The closest is *Mesa Petroleum Co. v. Cities Service Co.,* 715 F.2d 1425 (10th Cir.1983), where the court said that a prosecutor's "absence of ... intent" to prosecute provided "too slender a reed on which to rest our decision as to whether a live controversy is presented." *Id.* at 1431. In fact the officer charged with the enforcement of the act had simply told the court he had no current plans to prosecute. Before the district court, the agency had said that "state law is determinative of [its] enforcement intentions," *id.,* language that may well have seemed a

---

the statute is later found to be valid, the State is free to seek penalties for violations that occurred during the period the injunction was in effect," *id.* at 656, 102 S.Ct. at 2648, they asserted a power in the federal courts to issue injunctions providing permanent protection, and would have presumed that any ambiguous injunction did so, *id.* at 657–58, 102 S.Ct. at 2648–49.

3. But cf. *Burke v. Barnes,* 479 U.S. 361, 364, 107 S.Ct. 734, 736–37, 93 L.Ed.2d 732 (1987) (rejecting argument that possibility of action to recover funds allegedly spent in violation of Anti-Deficiency Act saves a case from being moot, stating that "[t]here is no indication of a presently existing dispute as to the accounting obligations, and if such a dispute were to arise it would not be between the parties to this case.").

deliberate equivocation. These quibblings are a far cry from the government's representation and concession here.

All told, then, appellees' proclaimed fear of prosecution under the Anti–Deficiency Act is far too speculative to keep the case alive.

### B. Exceptions to Mootness.

■ Appellees argue that even if the case is superficially moot, it falls within two exceptions to the doctrine—the common one for "actions capable of repetition yet evading review," and the related but narrower one addressing a defendant's voluntary cessation of the offending conduct. Both exceptions involve instances where, despite the apparent demise of the controversy, its resolution has a reasonable chance of affecting the parties' future relations.[4]

Common to both exceptions is the task of defining the wrong that the defendant is alleged to have inflicted. What is the injury that is capable of repetition, and what are the "old ways" to which the voluntarily ceasing defendant might return? See *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (voluntary cessation exception rooted in interest in protecting plaintiff from defendant's possible "return to his old ways"). The opportunities for manipulation are great. The more broadly we define the wrongful conduct, the more numerous are the possible examples, and the greater the likelihood of repetition. Of course there are practical limits. As the defined injury is broadened, it is likely to sweep up actions that last a long time and thus do not evade review. Here, for example, if we defined the alleged wrong as conditioning funding upon legislators' performance of the expressive conduct inherent in legislation, the action would by no means evade review, as Congress often embeds such conditions in permanent legislation. See, e.g., 23 U.S.C. § 158 (1988)

(withholding a percentage of federal highway funds from states that do not prohibit those under 21 from buying alcohol); 47 U.S.C. § 399 (1982) (prohibiting any noncommercial educational broadcasting station that receives federal funds from "editorializing" or endorsing candidates).

The United States would define the alleged injury as congressional use of funding to induce appellees to enact specific language allowing religiously affiliated institutions to discriminate against homosexuals. But facts completely irrelevant to any intelligible formulation of plaintiffs' claim—such as the specific issue on which Congress sought to induce plaintiffs' votes—are equally irrelevant to the mootness issue. See *Amalgamated Transit Union, AFL–CIO v. Brock*, 809 F.2d 909, 914–15 (D.C.Cir.1987).

In their brief opposing mootness, appellees appear to wobble in their notion of the injury. At one point they frame the issue as "whether Congress can coerce the Council Members' votes by withholding appropriated funds," Brief for Appellees at 31, while elsewhere they speak of Congress's "attempt[ing] to coerce the Council Members into voting to adopt a *prescribed* law," *id.* at 24 (emphasis added), thus seeming to echo their complaint's focus on Congress's insistence on enactment of specific language. In any event, where plaintiffs are resisting a mootness claim we think they must be estopped to assert a broader notion of their injury than the one on which they originally sought relief. Cf. *Tallahassee Memorial Regional Med. Ctr. v. Bowen*, 815 F.2d 1435, 1449–50 & n. 28 (11th Cir.1987) (looking to complaint to determine scope of plaintiff's alleged injury).

Here the plaintiffs never sought a broad invalidation of conditioned funding generally. Indeed, they made no claim at all against the other provisions in the 1989 Act that conditioned funds on District legislation but refrained from demanding specific language. See, e.g., Pub.L. No. 100–462,

---

**4.** It may be that the requirement of probable recurrence between the *same* parties is dropped where it is likely that the issue will recur between the defendant and others without ever reaching the Supreme Court. See *Honig v. Doe*, 484 U.S. 305, 335–36, 108 S.Ct. 592, 610, 98 L.Ed.2d 686 (1988) (Scalia, J., dissenting).

§ 141, 102 Stat. at 2269–13 (conditioning expenditure of funds on the D.C. government's implementing "a preference system that does not preclude the hiring of noncity residents"); *id.*, § 143, 102 Stat. at 2269–13 (conditioning all funds on the District's repealing an existing law prohibiting testing for AIDS as a condition of acquiring insurance, and passing another to allow for such testing); *id.*, Federal Payment to the District of Columbia, 102 Stat. at 2269 (conditioning $430 million on the District's maintaining a police force of at least 3880 officers).

Instead, appellees attacked the Armstrong Amendment as violating their First Amendment rights by conditioning funds on their enactment of *particular language.* Count III of the Complaint, the one relevant here, is titled "Violation of the Free Speech Clause of the First Amendment by Coercing *Particular Speech* by the Members of the Council." Joint Appendix 32 (emphasis added). It goes on to argue that "[t]he Armstrong Amendment coerces plaintiffs to propose and to vote in favor of amending the D.C. Human Rights Act, *using the particular language dictated by Congress.*" *Id.* at ¶ 61 (emphasis added); see also *id.* at ¶ 62 ("A law compelling *particular speech, especially particular political speech,* is presumptively invalid. . . .").

It may well be appropriate to narrow the injury or conduct still further, by reference to (1) the especially coercive character of Congress's having conditioned *all* District appropriations on enactment of the required legislation, and (2) the gratuitous character of its use of conditioned funding to do something it could easily have done by direct exercise of its plenary power over the District. Count III speaks of the Armstrong Amendment's having "coerced" the plaintiffs into adopting the specified legislation, *id.*, and earlier argues that by "threatening to freeze all District expenditures, the Armstrong Amendment coerces" plaintiffs' votes, *id.* at ¶ 33; so perhaps Count III used "coerc[ion]" in that very specific sense. Also, Count III explicitly says that Congress failed to "proceed in a manner designed to constitute the least

possible interference with free speech," *id.* at ¶ 62, seemingly invoking Congress's alternative option. We need not resolve whether these were essential to plaintiffs' original theory of their claim, however, as we find below that even the injurious act as more broadly conceived—conditioning funding on enactment of legislation in specific language—is not "capable of repetition yet evading review" and cannot properly be characterized as conduct that the defendants have voluntarily ceased.

*Capable of repetition, yet evading review.* In order to fit the case into one of the "exceptional situations" to which this doctrine applies, see *Continental Bank,* 110 S.Ct. at 1255 (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983)), appellees must demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975)); see also *Honig v. Doe,* 484 U.S. 305, 318–20, 108 S.Ct. 592, 601–02, 98 L.Ed.2d 686 (1988). Whatever the precise meaning of "reasonable expectation," compare *Honig,* 484 U.S. at 318–19 n. 6, 108 S.Ct. at 601–02 n. 6 (1988) (opinion of Brennan, J., for the Court), with *id.* at 333–36, 108 S.Ct. at 609–11 (Scalia, J., dissenting), appellees have not shown it.

In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past. Here, the Armstrong Amendment represents the *sole* occasion on which Congress has used conditioned funding to induce the D.C. Council (or any other government, so far as appears) to enact particular language into law. The amendment thus was, as a member of this court put it at oral argument, a purple cow. We have no reason at all to expect to see one ever again, especially as Congress is free to

avoid problems of the present sort by amending the D.C.Code directly.

It is true that Senator Armstrong stated at one point that he was "tempted to simply offer the same amendment again." 135 Cong.Rec. S11104 (daily ed. Sept. 14, 1989). The resisted temptations of one senator, however, even if expressed on the floor of Congress, are hardly a good barometer of the likelihood of a congressional repeat.

Further, even if Congress were again to try to induce enactment of precisely worded legislation by means of conditioned funding, the effort would not necessarily evade review, or even be especially likely to do so. Congress often embeds a conditioned funding mechanism in permanent law. See p. 703 above. There is no reason to think that conditions exacting particular language are systematically linked with short-lived appropriations; with only one instance, there is no way to generalize.

*Voluntary cessation.* Early cases developing the exception for a defendant's voluntary cessation focused on preventing a private defendant from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to "return to his old ways." See, e.g., *W.T. Grant,* 345 U.S. at 632, 73 S.Ct. at 897; *United States v. Trans–Missouri Freight Ass'n,* 166 U.S. 290, 308–09, 17 S.Ct. 540, 546–47, 41 L.Ed. 1007 (1897); cf. *Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co.,* 242 U.S. 202, 207–08, 37 S.Ct. 105, 106–07, 61 L.Ed. 248 (1916). See also Wright, Miller & Cooper, *Federal Practice and Procedure,* § 3533.5 at 326 (1984). Even assuming Congress could properly be classified as a defendant in this action (which we doubt), the argument fails.

Although the doctrine has more recently been applied to legislative bodies, see, e.g., *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982); *Quern v. Mandley,* 436 U.S. 725, 733–34 n. 7, 98 S.Ct. 2068, 2074 n. 7, 56 L.Ed.2d 658 (1978), appellees point to no case applying the doctrine to Congress, and we have found none. We

have serious doubts whether it could be. At least in the absence of overwhelming evidence (and perhaps not then), it would seem inappropriate for the courts either to impute such manipulative conduct to a co-ordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose.

Although the Supreme Court seems not to have addressed the issue, we think it telling that it failed even to mention voluntary cessation in a case where, if it encompassed Congress, the doctrine would be highly relevant. In *Department of Treasury v. Galioto,* 477 U.S. 556, 106 S.Ct. 2683, 91 L.Ed.2d 459 (1986), the Court dismissed as moot a challenge to statutes effectively denying anyone who had been committed to a mental institution access to firearms. While the case was pending before the Supreme Court, Congress amended the law to provide an administrative remedy for those affected. There, as in *Quern* and *City of Mesquite,* Congress was free to "return to its old ways" when the action was dismissed.

We need not decide the issue, however, for we find that non-reenactment of a one-time condition that expired of its own terms cannot be viewed as cessation of conduct. In every case applying the voluntary cessation doctrine, the decision to stop the disputed activity was made while the litigation was pending, by, for example, altering an ordinance, *City of Mesquite,* withdrawing from a federal program, *Quern,* or resigning from boards of competing companies, *W.T. Grant.* Here, the expiration date of the 1989 Act was set well before this dispute arose, and was chosen for reasons having nothing to do with the Armstrong Amendment. (Nor, of course, did the brief extensions of the 1989 Act arise from the amendment or its litigation.) In essence, Congress shot an arrow into the air, and it fell to earth. It stretches the words beyond recognition to say that Congress "voluntarily ceased" anything merely because it refrained from shooting some more arrows after the first landed. More important, extension of the

doctrine to this case would not fit its basic theory. While the cessation of an ongoing activity pending a lawsuit may well imply an intent to renew the activity once the court has dropped out, this is hardly true of Congress's allowing a one-time provision to pass into history by its own terms.

Appellees make much of a claim that Congress's non-renewal of the Armstrong Amendment was moved by a purpose to evade judicial review. We will assume arguendo that such a purpose played a significant role in the decision. But as Congress possesses an indisputably valid procedure for achieving its substantive purposes (namely, direct amendment of the D.C. Code), its nonrenewal of the disputed procedure hardly suggests either the manipulative purpose, or the risk of recurrence, that drives the voluntary cessation exception. Cf. *Flynt v. Weinberger*, 762 F.2d 134, 135 n. 1 (D.C.Cir.1985) (declining to apply voluntary cessation doctrine where "the challenged act is short-term in nature and discontinued after having achieved its objective").

## II. *Remedy*

■ Having determined that the case is moot, we must still decide whether it is appropriate to vacate the panel opinion and remand to the district court with instructions to dismiss Count III of the complaint. We find that it is.

In *United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), the Court noted that the "established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *Id.* at 39 & n. 2, 71 S.Ct. at 106–07 & n. 2 (collecting cases); see also *City of Mesquite*, 455 U.S. at 288 n. 9, 102 S.Ct. at 1074 n. 9. Federal courts of appeals have followed suit, vacating district court decisions that became moot before the court of appeals' own disposition. See, e.g., *Matson Navigation Co. v. United States*, 825 F.2d 502 (D.C.Cir.1987).

The Supreme Court has also vacated its own decision when a case became moot after the decision issued but before its disposition of a petition for rehearing. *Stewart v. Southern Ry. Co.*, 315 U.S. 784, 62 S.Ct. 801, 86 L.Ed. 1190, vacating as moot 315 U.S. 283, 62 S.Ct. 616, 86 L.Ed. 849 (1942). Again the courts of appeals have pursued a parallel course. Thus in *United States v. Caraway*, 483 F.2d 215 (5th Cir. 1973), the court *en banc* vacated a panel decision because the case had become moot after the panel opinion issued but "prior to the issuance of the mandate of this court and prior to the sua sponte determination to consider the appeal en banc." *Id.* at 216. Similarly, in *In re Ghandtchi*, 705 F.2d 1315, 1316 (11th Cir.1983), a panel vacated its decision when the case became moot after the opinion issued, but before the time limit for seeking *en banc* ran or the mandate issued, and in *United States v. Miller*, 685 F.2d 123 (5th Cir. Unit B 1982), a panel vacated its opinion on learning "[b]efore issuance of the mandate" that the case had become moot. In addition, panels vacate their decisions on learning that the case became moot before issuance. *Ruiz v. Estelle*, 688 F.2d 266 (5th Cir.1982) (partial vacatur, limited to issue parties had settled); *Bumpus v. Clark*, 702 F.2d 826 (9th Cir.1983). Wright, Miller and Cooper go further. They argue that because the Supreme Court conventionally grants certiorari on moot cases, and vacates and remands with instructions to dismiss, it is "appropriate for a court of appeals to vacate its own judgment if it is made aware of events that moot the case during the time available to seek certiorari." *Federal Practice and Procedure* § 3533.10 at 435.

As this case became moot on November 20, 1989 with the lapse of the 1989 Appropriations Act, and there was on that date no disposition of the suggestion for *en banc* review and no issuance of the mandate, the standard practice of both the Supreme Court and the courts of appeals calls for automatic vacatur.

The present case presents, however, a curiosity, in that the court's decision of December 15, 1989 not to rehear the merits

*en banc* could be viewed as removing the prime reason for vacatur—to protect the losing party from the collateral effects of a judgment that it might have been able to have overturned but for the mooting event.[5] *Munsingwear*, 340 U.S. at 40–41, 71 S.Ct. at 107.

But this sequence does not affect the matter. As the court can dis-*en banc* a case that it has ordered heard *en banc*, see *Bartlett v. Bowen*, 824 F.2d 1240 (D.C.Cir. 1987), it presumably retains the power to reverse a denial of *en banc* review until the issuance of the mandate. Indeed, in rejecting the call for rehearing *en banc*, the court explicitly withheld issuance of the mandate "pending disposition by the *en banc* Court of appellant's Suggestion of Mootness and Motion to Vacate." *Clarke v. United States*, 898 F.2d 161 (D.C.Cir. 1989). At a minimum, our withholding of the mandate must insulate the mootness and vacatur issues from the merits vote; the outcome on the merits cannot moot the mootness.

Appellees suggest two reasons not to vacate: first, that vacatur of a decision that becomes moot after issuance is inappropriate where mootness results from a deliberate act of the losing party rather than "by happenstance"; second, that vacatur of a decision moot after issuance is discretionary, not mandatory, and that our discretion should be exercised against vacatur. We can resolve these claims without trying to speak definitively to the scope of the first or the soundness of the second. The first is inapplicable; and to the extent the issue is discretionary, we believe the context argues for vacatur.

In *United States v. Garde*, 848 F.2d 1307 (D.C.Cir.1988), we declined to vacate under *Munsingwear* where a government agency appealed a district court decision, and then complied with its requirements and applied for its vacatur. We reasoned that a practice of vacatur on these facts would encourage litigants who were dissatisfied with a

result to wipe out its precedential and preclusion effects by compliance, and would be unfair to winners in the district court by cheating them of some of the fruits of their victory. See also *Center for Science in the Public Interest v. Regan*, 727 F.2d 1161 (D.C.Cir.1984); but see *Board of Regents v. New Left Project*, 414 U.S. 807, 94 S.Ct. 118, 38 L.Ed.2d 43 (1973) (vacating without explanation, 472 F.2d 218 (5th Cir. 1973), and remanding to district court for vacatur of its judgment; the court of appeals had refused to vacate district court judgment on *Garde*-like grounds).

Some commentators have argued that courts can better address these concerns in determining whether the voluntary cessation of conduct by the defendant has caused the case to become moot in the first place. See Wright, Miller & Cooper, *Federal Practice and Procedure* § 3533.10 at 430–31 (1984). Whatever the merits of that view, it exposes the point that these cases are only applying a milder version of the voluntary cessation doctrine: the case is not live enough for adjudication on the merits, but because of fears of manipulation by the losing party the court denies it the benefit of vacatur. See *Commodity Futures Trading Comm'n v. Board of Trade*, 701 F.2d 653, 657 (7th Cir.1983) (noting the link). For the reasons developed at pp. 705–06, however, *no* version of the voluntary cessation doctrine is applicable here. Even if Congress were the defendant, its non-reenactment of a one-time provision that expired pursuant to its own terms—terms adopted in advance of any litigation and with no anticipation of its arising—cannot be considered voluntary cessation or "compliance" with the panel decision.

Two recent decisions have suggested that where a court of appeals decision is mooted after issuance, the decision to vacate should be discretionary. *Armster v. United States Dist. Court*, 806 F.2d 1347,

---

**5.** Thus the cases talk variously of either the issuance of the mandate, or of the filing (or disposition) of an application for rehearing, as the moment that brings to an end the duty to vacate a decision for prior mootness. Of course normally these run close together; under Rule 41(a) of the Federal Rules of Appellate Procedure the filing of a petition for rehearing stays the mandate automatically.

1355 (9th Cir.1986) (although finding the case not moot, *id.* at 1353–54, and subject to one of the exceptions to mootness, *id.* at 1357–61, court argues that where mootness follows decision vacatur is within court's discretion); *Commodity Futures Trading Comm'n* (focusing exclusively on issue preclusion effects, court declines to vacate district court decision or appellate decision issued before mooting event).

Whatever the merits of this view—which would appear to represent a change from *Stewart v. Southern Ry. Co.*, 315 U.S. 784, 62 S.Ct. 801, 86 L.Ed. 1190 (1942)—the judges of the majority who believe it correct also believe that on the present facts vacatur is appropriate for both our and the district court decisions.

*Any* decision granting the plaintiffs relief on their First Amendment theory, no matter how narrowly confined (e.g., limited to cases conditioning 100% of funds available to the governing entity—including those from sources other than the federal government—and requiring enactment of specific language), would carry broad implications. Except for *Miller v. Town of Hull*, 878 F.2d 523 (1st Cir.1989), the panel opinion is the sole court of appeals decision finding legislators' votes subject to conventional First Amendment analysis. Cf. *Spallone v. United States*, —— U.S. ——, 110 S.Ct. 625, 646 n. 12, 107 L.Ed.2d 644 (1990) (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting) (characterizing as "unpersuasive" the argument that legislative voting is speech protected by the First Amendment; "[w]hile the act of publicly voting on legislation arguably contains a communicative element, the act is quintessentially one of governance"; the majority did not reach the issue.); *Clarke v. United States*, 886 F.2d 404, 418 (D.C.Cir.1989) (Buckley, J., concurring) (describing issue as "an important case of first impression"). Its shadow would fall on all the myriad conditioned funding provisions used by Congress (see, e.g., *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)) and by state or local governments.

Vacatur appears particularly appropriate where retention of the precedent creates a gratuitous conflict with a co-equal branch of government. In *Matter of City of El Paso, Texas*, 887 F.2d 1103, 1106 (D.C.Cir. 1989), though by no means suggesting that vacatur for mootness was discretionary, we emphasized the avoidance of constitutional questions as one of the bases for vacatur. Similarly, in a context where the Supreme Court has explicitly regarded its application of the mootness doctrine as discretionary— where the mootness applies only to named members of a plaintiff class—it has viewed the constitutional character of the decision as compelling vacatur. *Kremens v. Bartley*, 431 U.S. 119, 133–34 & n. 15, 97 S.Ct. 1709, 1717 & n. 15, 52 L.Ed.2d 184 (1977) (citing Justice Brandeis's concurring opinion in *Ashwander v. TVA*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936)). The point is equally applicable here.

Appellees suggest that the government here is in some kind of logical bind: if the issue is *not* "capable of repetition yet evading review," they suggest, then preserving the decision can have no impact. Of course the argument ignores the core of the adjudicatory process, reasoning by analogy. As Judge Buckley noted in his concurrence, "we may have opened the door to more litigation than we can now appreciate." *Clarke*, 886 F.2d at 418. It being unnecessary to open the door at all on the present facts, we return it to its pre-existing condition, neither open nor shut. The decision of the panel is vacated, and case is remanded to the district court to vacate its decision and to dismiss Count III of the complaint as moot.

*So ordered.*

BUCKLEY, Circuit Judge, with whom D.H. GINSBURG, Circuit Judge, joins, *concurring:*

I agree with all but one aspect of the court's excellent opinion, namely, its characterization of the wrong that Congress is alleged to have inflicted on the members of the District of Columbia Council. Because it ignores the critical element of their com-

plaint, the court's "capable of repetition" analysis is less convincing than it might be.

The court has defined the alleged wrong as the violation of the Councilors' First Amendment rights "by conditioning funds on their enactment of *particular language.*" Court Op. at 704 (emphasis in original). While it is true that Count III of the Complaint refers to the fact that the Armstrong Amendment conditioned funding on the District's adoption of "particular speech," the court's formulation overlooks the essence of the alleged wrong, which is Congress's use of draconian conditions to compel it to do so:

> The Armstrong Amendment *coerces plaintiffs* to propose and to vote in favor of amending the D.C. Human Rights Act, using the particular language dictated by Congress, ... *by threatening to freeze all District expenditures on January 1, 1989* unless the plaintiffs have proposed and voted for that Amendment.

Complaint at Count III, para. 61 (emphasis added).

The basis for the Councilors' First Amendment claim is not that funding is conditioned on the adoption of particular language, but that the conditions coerce legislative speech. Except for this factor, the Amendment is indistinguishable from a host of grant-in-aid programs in which Congress conditions federal funding on a State's adoption of specific action. I can see little principled difference between a federal statute that conditions funding on a State's enactment of legislation qualifying it to participate in a federal program and one that specifies the language that the State must enact in order to do so. On the other hand, there is a world of difference between a statute that, for example, would induce a State to change its legal drinking age rather than "lose a relatively small percentage of certain federal highway funds" and one in which "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211, 107 S.Ct. 2793, 2798–99, 97 L.Ed.2d 171 (1987) (citation omitted).

Here, the "financial inducement" offered by the Armstrong Amendment was clearly coercive. Had Congress invoked its constitutional authority to order the District to enact the desired change in its Human Rights Act, *see* U.S. Const. art. I, § 8, the Councilors would have been called upon to act in a ministerial rather than a legislative capacity. *See Spallone v. United States*, — U.S. —, 110 S.Ct. 625, 646 n. 12, 107 L.Ed.2d 644 (1990) (Brennan, J., dissenting) ("voting to implement a remedial decree is best understood as a ministerial step in the process of executing a decision made by government actors with superior authority"). But because Congress elected to provide the District with a Hobson's choice, the Councilors were able to argue that their legislative speech was being compelled.

Given the above, I would have characterized the alleged wrong as Congress's violation of the Councilors' First Amendment rights through its use of coercive conditions to compel the District to enact a particular measure. I would then have found the alleged wrong unlikely of repetition because the Armstrong Amendment was aberrational. As the court points out, it is unprecedented. *See* Court Op. at 704. Moreover, as Congress has the unquestioned power to effect its will either by direct order or through the exercise of its reserved authority, under the District of Columbia Self–Government and Governmental Reorganization Act, to enact laws on behalf of the District, there is no reason to believe that Congress will again seek to achieve by indirection what it can so readily command.

EDWARDS, Circuit Judge, with whom MIKVA and RUTH BADER GINSBURG, Circuit Judges, and ROBINSON, Senior Circuit Judge, join, dissenting:

The issue in this case is whether a court of appeals is obliged to vacate its own decision when postjudgment contingencies allegedly render the underlying controversy moot. The panel in this case held that the First Amendment prohibits Congress from compelling appellees, members of the

D.C. Council ("Council members"), to vote to enact a particular piece of legislation. After the panel issued its decision, Congress enacted the disputed legislation directly. Appellant United States subsequently moved to vacate the judgment of the panel as moot. Although the panel and *en banc* court decided not to rehear the merits of the panel's decision, the court did decide to consider *en banc* the United States' motion to vacate.

I would deny the motion without regard to whether the controversy between the United States and the Council members is now moot. Notwithstanding the rule that a court of appeals must ordinarily vacate *a lower court decision* when the case becomes moot *pending* appeal, *see United States v. Munsingwear*, 340 U.S. 36, 39, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950), a court of appeals has no duty to vacate *its own decision* once *postjudgment* contingencies arguably moot the case. *See Armster v. United States District Court*, 806 F.2d 1347, 1355–56, 1356 n. 12 (9th Cir. 1986); *Finberg v. Sullivan*, 658 F.2d 93, 96 n. 4, 97 n. 6 (3d Cir.1980) (*en banc*) (dictum). In such a situation, the absence of a still live controversy poses no jurisdictional obstacle, because the court has already disposed of the case. Nor is vacatur necessary to protect the losing party from being bound by an unreviewable judgment. By that point, the loser has received all of the appellate review to which he is entitled as of right; if discretionary review *would have been* forthcoming from the Supreme Court, the losing party will be protected by the Court's practice of vacating court of appeals decisions in cases that are certworthy but moot.

The only circumstance in which a court of appeals should vacate its own decision is where the court determines that, but for the mootness of the case, *it* would have revisited the merits of its decision. Insofar as we have already denied the United States' petition for rehearing and suggestion for rehearing *en banc*, this condition is not satisfied here. Therefore, I dissent.

## I.

This case arises from enactment of the Nation's Capital Religious Liberty and Academic Freedom Act, Pub.L. No. 100–462, § 145, 102 Stat. 2269–14 (1988) ("Armstrong Amendment I"). Intended to overturn *Gay Rights Coalition v. Georgetown University*, 536 A.2d 1 (D.C.1987) (*en banc*), Armstrong Amendment I conditioned expenditure of the District's 1989 appropriations on the Council's enactment of an amendment to the D.C. Human Rights Act, D.C.CODE §§ 1–2501 to 1–2557 (1989), to permit religiously affiliated educational institutions to discriminate against homosexuals. Congress chose to compel members of the Council to vote to enact the disputed legislation rather than amend the Human Rights Act itself; this was done in order to comply with parliamentary rules prohibiting "substantive" legislation in an appropriations bill. *See United States v. Clarke*, 886 F.2d 404, 408–09 (D.C.Cir. 1989).

Instead of submitting to Armstrong Amendment I, the Council members decided to test in court Congress' authority to compel members of the Council to vote to enact specific legislation. Ruling only hours before all municipal services in the District were to be shut down, the District Court held that Armstrong Amendment I violated the First Amendment rights of the Council members. *See Clarke v. United States*, 705 F.Supp. 605 (D.D.C.1988). A unanimous panel of this court affirmed, reasoning, *inter alia*, that Congress' interest in protecting the integrity of its parliamentary procedures was insufficient to justify the abridgment of the Council members' speech rights. *See* 886 F.2d at 414.

During the pendency of the appeal in *Clarke*, Congress began deliberations on the 1990 version of the D.C. appropriations act. Responding to the decision of the District Court, Senator Armstrong introduced legislation directly amending the D.C. Human Rights Act. *See* 135 CONG. REC. S11,104 (daily ed. Sept. 14, 1989) ("Armstrong Amendment II"). Senator Armstrong explained that he was "really tempted to simply offer [Armstrong

Amendment I] again and leave the matter to the courts to decide." *Id.* But because Congress' authority to compel legislation by the Council was a "peripheral question," he viewed it as more prudent simply to amend the Human Rights Act directly rather than let the pending legal dispute "play out, which is exactly what would happen if we were to reenact [Armstrong Amendment I]." *Id.* In sum, Armstrong Amendment II was designed, in Senator Armstrong's words, to "short-circuit" the controversy surrounding the means Congress had selected to achieve the desired amendment of D.C. law. *Id.* The 1990 D.C. Appropriations Act, along with Armstrong Amendment II, was signed into law on November 21, 1989, Pub.L. No. 101–168, § 141, 103 Stat. 1284, *fifty-five days after entry of judgment in this court and eight days after the United States had submitted its petition for rehearing on the merits.*

On November 24, 1989, the United States moved to vacate *Clarke* as moot under *United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). On December 15, the panel voted to deny the United States' petition for rehearing and its motion to vacate. On the same day, the full court voted to deny the United States' suggestion of rehearing *en banc* on the merits, but to grant *en banc* rehearing on the motion to vacate on grounds of mootness.

## II.

### A.

Disposition of the United States' motion turns largely on identifying the proper scope of the *Munsingwear* doctrine. In *Munsingwear,* the Supreme Court established that the proper disposition when

a civil case from a court in the federal system ... has become moot while on its way [to review by an appellate court] or pending [the appellate court's] decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss.

340 U.S. at 39, 71 S.Ct. at 106. The purpose of this rule is to protect the losing party from being bound by a judgment "review of which was prevented through happenstance." *Id.* at 40, 71 S.Ct. at 107.[1]

It is generally accepted that *Munsingwear* does not control *all* cases that become moot at some point after judgment in the district court. *See United States v. Garde,* 848 F.2d 1307, 1310 & n. 6 (D.C.Cir. 1988). Although the onset of mootness prevents the reviewing court from taking further action on the merits of the case, courts of appeals have declined to apply *Munsingwear's* vacatur remedy when the losing party's interest in not being bound by an unreviewable judgment is inapplicable or is outweighed by competing considerations. An example is where a case *settles* prior to appellate court disposition. *See National Union Fire Ins. Co. v. Seafirst Corp.,* 891 F.2d 762, 766 (9th Cir.1989); *In re Memorial Hosp.,* 862 F.2d 1299, 1301–02 (7th Cir.1988); *see also Clipper v. Takoma Park,* 898 F.2d 18, 19 (4th Cir. 1989) (declining to vacate court of appeals decision following postjudgment settlement). The courts in these cases have declined automatically to vacate judgments in this posture. There are two reasons for this: one is that the party who lost at trial has abandoned his interest in seeking appellate review; the other is that vacatur would undermine the interests of third parties and the judicial system as a whole in final resolution of a disputed legal question. *See National Union Fire Ins. Co.,* 891 F.2d at 766, 768; *In re Memorial Hosp.,* 862 F.2d at 1301–03.[2]

---

**1.** Notwithstanding mootness in this setting, both parties retain an interest in the collaterally preclusive effects of the lower court's judgment. *Munsingwear,* then, addresses the question of when it is fair to relieve the losing party from these effects because of the unavailability of appellate review. *See id.* at 39–40, 71 S.Ct. at 106–07. *See generally* 1B J. MOORE, J. LUCAS & T.

CURRIER, MOORE'S FEDERAL PRACTICE § 0.416[6] (2d ed. 1988).

**2.** The practice of these circuits is consistent with that of the Supreme Court, which also merely dismisses without vacating cases that settle pending disposition in that court. *See, e.g., Minnesota Newspaper Ass'n, Inc. v. Postmaster*

In addition, this court, following the lead of other circuits, has declined to apply *Munsingwear* in cases that become moot not because of "happenstance" but because of "the deliberate action of the losing party." *Center for Science v. Regan,* 727 F.2d 1161, 1165 (D.C.Cir.1984); *accord Garde,* 848 F.2d at 1310; *see also Ringsby Truck Lines, Inc. v. Western Conference of Teamsters,* 686 F.2d 720, 721 (9th Cir. 1982); *Wisconsin v. Baker,* 698 F.2d 1323, 1331 (7th Cir.), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983). In this situation, too, because the losing party has forfeited his interest in appellate review, we have declined to vacate the judgment below "in order to avoid unfairness to *[the] part[y] who prevailed* in the lower court." *Garde,* 848 F.2d at 1310 (emphasis added). We also have noted that to apply *Munsingwear's* vacatur remedy in this setting would "encourage litigants who are dissatisfied with the decision of the trial court 'to have the[ ] [decision] wiped from the books' by merely filing an appeal, then complying with the order or judgment below and petitioning for a vacatur of the adverse trial court decision." *Garde,* 848 F.2d at 1311 (quoting *Ringsby,* 686 F.2d at 721). *See generally* 1B J. MOORE, J. LUCAS & T. CURRIER, *supra* note 1, ¶ 0.416[6], at 543 ("It would be quite destructive to the principle of judicial finality to put ... a litigant in a position to destroy the collateral conclusiveness of a judgment by destroying his own right of appeal.").

Contrary to what the United States contends, the case now before the court also does not fit squarely within the *Munsingwear* mold. Even assuming that the passage of Armstrong Amendment II ended the controversy between the United States and the Council members, the case did not become moot "on its way" to the Court of Appeals "or pending [the Court of Appeal's] decision on the merits," *Munsingwear,* 340 U.S. at 39, 71 S.Ct. at 106, but only *after* the panel had issued its decision and entered judgment. The question posed by the United States' motion, then, is whether *Munsingwear's* protective rationale takes hold in a case in this posture. In my view, the answer is no.

### B.

In considered discussions of the issue, both the Ninth and the Third Circuits have concluded that *Munsingwear* does not compel a court of appeals to vacate its own decision when postjudgment contingencies render the underlying controversy moot. *See Armster v. United States District Court,* 806 F.2d 1347, 1355–56, 1356 n. 12 (9th Cir.1986); *Finberg v. Sullivan,* 658 F.2d 93, 96 n. 4, 97 n. 6 (3d Cir.1980) (*en banc*) (dictum). Instead, these courts have treated vacatur as only a discretionary remedy. *See Armster,* 806 F.2d at 1355; *Finberg,* 658 F.2d at 96 n. 4. Although one circuit apparently has adopted a different approach, *see In re Ghandtchi,* 705 F.2d 1315, 1316 (11th Cir.1983),[3] I find the rea-

---

*General,* 488 U.S. 998, 109 S.Ct. 632, 102 L.Ed.2d 766 (1989) (dismissing appeal); *St. Lukes Fed'n v. Presbyterian/St. Lukes Medical Center,* 459 U.S. 1025, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982) (dismissing petition for writ of *certiorari* ). The Second Circuit follows a different rule. *See Long Island Lighting Co. v. Cuomo,* 888 F.2d 230, 233–34 (2d Cir.1989). This circuit has yet to resolve the issue definitively. *Compare Garde,* 848 F.2d at 1310 (declining to apply *Munsingwear* in case in which the losing party "essentially settled" by accepting less than full amount of information sought in subpoena not enforced by District Court) *with Douglas v. Donovan,* 704 F.2d 1276, 1280 (D.C.Cir.1983) (applying *Munsingwear* without discussion to case mooted by settlement).

**3.** The United States cites four other cases from outside the Eleventh Circuit in support of its

claim that circuit courts "generally concur" that *Munsingwear* applies when a case moots after judgment in the court of appeals. Brief for Appellant on Consideration En Banc at 37 & n. 4. In two of the cases, the mooting episode had, without the courts' knowledge, occurred *before* the courts entered their judgments. *See Bumpus v. Clark,* 702 F.2d 826, 826–27 (9th Cir. 1983); *Ruiz v. Estelle,* 688 F.2d 266, 267 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). Vacatur was therefore necessary because the courts lacked subject matter jurisdiction *at the time they issued their decisions.* In another, it is unclear whether the mooting episode occurred before or after the court issued its opinion. *See United States v. Miller,* 685 F.2d 123, 124 (5th Cir. Unit B 1982). Finally, in the fourth case, the court had not issued a decision on the merits, and instead routinely applied *Munsingwear* to a case

soning of the Ninth and Third Circuits persuasive.

The *Munsingwear* doctrine directs an appellate court to vacate a moot lower court disposition so that the losing party will not be bound by an " 'unreviewable' judgment." *Karcher v. May,* 484 U.S. 72, 82, 108 S.Ct. 388, 395, 98 L.Ed.2d 327 (1987). But if a case does not become moot until *after* the appellate court has entered *its* judgment, the losing party has not been deprived of review. It is true that mootness would prevent further review of the merits in the Supreme Court, but because review at that stage is *discretionary,* it does not follow that the *court of appeals* should vacate its own decision. If the case is "certworthy"—a determination that the Supreme Court alone is in a position to make—the *Supreme Court* can grant *certiorari* and summarily vacate. If the case does *not* warrant further consideration on the merits, the Court can simply deny *certiorari,* permitting the judgment of the court of appeals to stand. The losing party in such a case remains bound by the judgment, but he has suffered no cognizable prejudice. For, by hypothesis, he has received *all* of the appellate review that was forthcoming.[4]

Indeed, as applied to those cases in which the Supreme Court would *not* have granted *certiorari,* a rule requiring the court of appeals to vacate its own decision would be unfair to the *prevailing party.* The court of appeals would be depriving that party of the collateral benefits of his judgment notwithstanding the absence of any legitimate expectation of review on the part of the losing party. Avoiding this injustice is a central aim of our policy of declining to vacate a decision when the losing party causes the case to become moot. *See*

*Garde,* 848 F.2d at 1310; *Center for Science,* 727 F.2d at 1166.

A rule requiring a court of appeals to vacate its own decision on the basis of postjudgment contingencies would also risk the type of jurisdictional manipulation with which we were concerned in *Garde. See* 848 F.2d at 1311. As the Ninth Circuit points out,

[i]n the case of the government, heads of administrative agencies and other public officials could as a matter of course cause the withdrawal of decisions establishing unfavorable precedents or vindicating individual rights by complying with those decisions before the mandate issues. Such a result would be inconsistent with the manner in which our system of checks and balances is intended to operate.

*Armster,* 806 F.2d at 1356; *see also Finberg,* 658 F.2d at 97 n. 6 (expressing concern that rule requiring vacatur would "encourag[e] the losing party on appeal to seek to delay the issuance of the mandate and in the interim bring about, for the sole purpose of evading the unfavorable decision, events which moot the case").

Obviously, the Ninth and Third Circuit rule makes the most sense if we have reason to believe that the Supreme Court has taken upon itself the function of vacating moot court of appeals dispositions if, but only if, they are otherwise certworthy. All of the available evidence suggests that this is indeed the Court's practice. It is clear that the Court vacates such cases only selectively. *Compare, e.g., Tulare Lake Canal Co. v. United States,* 459 U.S. 1095, 103 S.Ct. 712, 74 L.Ed.2d 943 (1983) (summarily vacating under *Munsingwear*) *and Board of Governors v. Security Bancorp,* 454 U.S. 1118, 102 S.Ct. 962, 71 L.Ed.2d 105 (1981) (same) *with Velsicol Chem. Corp. v.*

that had become moot pending appeal. *See Kitlutsisti v. ARCO Alaska, Inc.,* 782 F.2d 800, 801 (9th Cir.1986). The United States omits any mention of the Ninth and Third Circuit rule in its brief.

**4.** Obviously, the analysis would be different if the losing party had an appeal as of right to the Supreme Court. In that situation, it could be said with absolute confidence that the losing

party had been prejudiced in the way that *Munsingwear* envisions—the loss of an opportunity to secure appellate review—whenever a case became moot after the court of appeals' judgment. With the repeal of 28 U.S.C. § 1252 (1982), however, all appeals from the circuit courts are now by *certiorari. See* Supreme Court Cases Selections Act, Pub.L. No. 100–352, § 1, 102 Stat. 662 (1988).

*United States*, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (merely denying *certiorari* without vacating) *and Local 102, Int'l Ladies' Garment Workers' Union v. United States*, 439 U.S. 1070, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979) (same).[5] Because it summarily disposes of these cases, the Court has not expressly confirmed that it limits vacatur to cases that would have been reviewed on the merits but for the intervening mootness. Nonetheless, the Court has been so understood by both lower courts and commentators. *See, e.g., Armster*, 806 F.2d 1347, 1356 n. 12; *Commodity Futures Trading Comm'n v. Board of Trade*, 701 F.2d 653, 657 (7th Cir.1983); Greenbaum, *Mootness on Appeal in Federal Courts: A Reexamination of the Consequences of Appellate Disposition*, 17 U.C. Davis L. Rev. 7, 47–48 & 48 n. 196 (1983); Note, *Collateral Estoppel and Supreme Court Disposition of Moot Cases*, 78 Mich.L.Rev. 946, 951 (1980).[6]

This explanation of the Court's selective use of vacatur also comports with the Supreme Court's practice in the analogous area of abatement. It is well established that the death of a criminal defendant abates the prosecution, and requires his conviction to be vacated if the defendant dies while his case is *pending* review by the court of appeals. *See, e.g., United States v. Oberlin*, 718 F.2d 894, 895 (9th Cir.1983). If, however, the defendant dies *after* the court of appeals affirms his conviction, the Supreme Court merely dismisses any outstanding petition for *certiorari without* vacating the conviction. *See Dove v. United States*, 423 U.S. 325, 96 S.Ct. 579, 46 L.Ed.2d 531 (1976), *overruling Durham v. United States*, 401 U.S. 481, 91 S.Ct. 858, 28 L.Ed.2d 200 (1971); *accord Warden v. Palermo*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977). The reason for the different dispositions is that a criminal defendant's interest in not standing convicted without appellate review is deemed to be exhausted once he has availed himself of his appeal as of right to the court of appeals. *See Durham*, 401 U.S. at 484, 91 S.Ct. at 860 (Blackmun, J., dissenting); *United States v. Pauline*, 625 F.2d 684, 685 (5th Cir.1980); *United States v. Moehlenkamp*, 557 F.2d 126, 128 (7th Cir.1977). There is no reason to impute to the Supreme Court a different philosophy about discretionary appeals in the civil setting.

Indeed, until this case, the United States was the primary proponent of limiting the vacatur remedy to *certworthy* moot civil appeals. For over a decade, the Government has consistently urged the Court *not* to apply *Munsingwear* but merely to deny *certiorari* in cases that have become moot following judgment in the court of appeals

---

**5.** In *Velsicol,* the losing party in the court of appeals petitioned for a writ of *certiorari,* requesting that the Supreme Court grant review and summarily vacate as moot under *Munsingwear. See* Petition for Writ of Certiorari at 5–6, 12, *Velsicol Chem. Corp. v. United States,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (No. 77–900). The Government did not contest the claim of mootness, but argued that the Court should merely deny the losing party's petition because the case would not have merited review had it remained live. *See* Brief for the United States in Opposition at 4–8, *Velsicol Chem. Corp. v. United States,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (No. 77–900). In *Local 102,* the case had apparently mooted when the losing parties complied with a court order to testify before a grand jury notwithstanding their claim of privilege; the Government again urged that the Court merely deny *certiorari* without vacating. *See* Memorandum for the United States in Opposition at 4 & n. 4, *Local 102, Int'l Ladies' Garment Workers' Union*

*v. United States,* 439 U.S. 1070, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979) (No. 78–633).

**6.** As the Court's practice of selective vacatur demonstrates, mootness of the underlying controversy does not prevent the losing party from seeking *certiorari* for the purpose of securing vacatur. In effect, even a case that is moot as to the merits remains live as to the appropriateness of a vacatur remedy. *Cf. Munsingwear,* 340 U.S. at 40–41, 71 S.Ct. at 107 (noting that Court has power to review "[d]enial of a motion to vacate" and "commonly" uses its broad supervisory powers over federal courts "to prevent a judgment, unreviewable because of mootness, from spawning any legal consequence"). Moreover, because both parties retain an interest in the collaterally preclusive effect of the judgment, *see* note 1 *supra,* the Court can rely on effective adversary presentation of all issues relevant to determining whether the remedy should be granted, including whether the case would have been otherwise certworthy.

but that are not otherwise worthy of review on the merits.[7] The Court's simple denial of *certiorari* in various of these cases forms the basis of the inference that the Court does not view *Munsingwear* as controlling once the losing party has exhausted his appeals as of right. *See Commodity Futures Trading Comm'n*, 701 F.2d at 657; Greenbaum, *supra*, at 47–48, 48 n. 196.

When confronted with the question at oral argument, the United States was unable to reconcile this position with its contention in this case that the *court of appeals* should *automatically* vacate its decision if the case becomes moot during the period for seeking review in the Supreme Court. This abrupt and unexplained about face only highlights that the real basis of the United States' motion is its displeasure with *the merits* of the panel's decision, not its concern to protect its right to be free of an unreviewable judgment.

### C.

The United States makes much of the fact that this case supposedly became moot during the pendency of the United States' petition for rehearing. According to the United States, the case remains pending before us until the petition is disposed of and our mandate has issued. Consequently, the United States contends, the court is obliged to vacate its judgment on *jurisdictional* grounds. I disagree.

If the principles underlying the Third and Ninth Circuit rule are sound—as I believe they are—the onset of mootness during the pendency of a petition for rehearing does not by itself require vacatur. The purpose of a petition for rehearing is to raise some defect in the decision meriting the court's

reconsideration. *See* FED.R.APP.P. 40(a). *Postjudgment* mootness does not in itself constitute such a defect, for at the time at which the panel issued its opinion, the case was, by hypothesis, fully live. *See Armster*, 806 F.2d at 1356–57. "[E]vents occurring subsequent to a decision on the merits do not usually deprive a court of jurisdiction retroactively." *Id.* at 1353.

Postjudgment mootness does deprive the court of the power *to grant* the petition and re-evaluate its judgment on the merits. But, again, because a party does not have a *right* to such review, this consideration does not warrant vacatur as a matter of course. The losing party is prejudiced by our inability to grant a petition for rehearing only when the party is able to raise points that would have warranted the exercise of our rehearing power. Thus, like the Supreme Court when it considers a case that has become moot during the pendency of a petition for *certiorari*, we should vacate a case that becomes moot during the pendency of a petition for rehearing only if we *would have* granted the petition. *See Armster*, 806 F.2d at 1356 n. 12; *Finberg*, 658 F.2d at 96 n. 4.

It is also immaterial that we have not yet issued the mandate in this case. A court of appeals' decision is "final" from the issuance of the *judgment*,[8] not from the issuance of the *mandate*. *See, e.g.,* S.CT.R. 13.4 ("The time for filing a petition for a writ of certiorari runs from the date the judgment or decree sought to be reviewed is rendered, and not from the date of the issuance of the mandate. . . ."). The mandate, which in this circuit as in others consists solely of a certified copy of the judgment and the opinion, *see* D.C.CIR. HAND-BOOK 64 (Aug. 1, 1987); 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL

---

7.  *See, e.g.,* Brief for the United States in Opposition at 4–8, *Velsicol Chem. Corp. v. United States*, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (No. 77–900); Brief for the Federal Trade Commission in Opposition at 11 n. 11, *Dairymen, Inc. v. FTC*, 462 U.S. 1106, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983) (No. 82–1428) (construing disposition in *Velsicol* to signal Court's adoption of rule limiting vacatur to cert-worthy cases); Memorandum for the Secretary of Commerce in Opposition at 10 n. 4, *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65

L.Ed.2d 902 (1980) (No. 78–1007). Memorandum for the United States in Opposition at 4 n. 4, *Local 102, Int'l Ladies' Garment Workers' Union v. United States*, 439 U.S. 1070, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979) (No. 78–633).

8.  Under the Federal Rules, the court ordinarily enters judgment upon issuance of its opinion. *See* FED.R.APP.P. 36. This procedure was followed here.

PRACTICE AND PROCEDURE § 3987, at 474 (1977), is merely the formal vehicle for conveying the terms of our disposition to the District Court. Issuance of the mandate is a purely ministerial function that ordinarily occurs automatically twenty-one days after entry of judgment or seven days after denial of a petition for rehearing. *See* FED.R.APP.P. 41(a).

Insofar as our issuance of the mandate is wholly separate from our consideration of the merits, it serves no purpose to tie the exercise of this function to the continued existence of the underlying controversy. *See Armster*, 806 F.2d at 1355 n. 9; *Finberg*, 658 F.2d at 96 n. 5, 97 n. 6. It is true that we can *reopen* our consideration of the merits by recalling the mandate where necessary "to avoid injustice." *Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 277 (D.C.Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). But that power, too, is discretionary, *see id.*, and thus its potential fore-closure by mootness does not warrant vacatur as a matter of course.

## III.

The majority appears to accept that our decision whether to vacate on the basis of postjudgment contingencies is discretionary rather than mandatory under *Munsingwear*. It is the majority's view of *when* that discretion is appropriately exercised with which I have the greatest disagreement.

To classify a particular remedy as "discretionary" is not to say that the remedy can be afforded for *any* reason that a court happens to give. *See, e.g., United States v. Kramer*, 827 F.2d 1174, 1179 (8th Cir. 1987) ("An abuse of discretion occurs when *a relevant factor* that should have been given significant weight is not considered [or] when *an irrelevant or improper factor* is considered...." (emphasis added)). "Discretion ... does not exist except as an area left open by a surrounding belt of restriction." R. DWORKIN, TAKING RIGHTS SERIOUSLY 31 (1977). In any given context, then, the proper exercise of discretion must be guided by the reasons that

make it appropriate to vest the court with discretion in the first instance.

As I have indicated, the reason that vacatur on the basis of postjudgment mootness is discretionary rather than mandatory is that the losing party in such a situation is not invariably prejudiced in the manner that *Munsingwear* envisions. The losing party has a legitimate claim to be spared from the collateral effects of the judgment only if further review of the merits would have been forthcoming but for the intervening mootness. Moreover, because only the Supreme Court is in a position to determine whether it would have granted *certiorari*, vacatur to protect the losing party's interest in Supreme Court review should be the responsibility of the Supreme Court, not the court of appeals.

It follows that the only circumstance in which the court of appeals should exercise its discretion to vacate is when it determines that *it* would have revisited the merits of its decision—either by rehearing or by recall of the mandate—had the case not become moot. That is the only situation in which the court of appeals is in a position both to determine that the losing party has been prejudiced by postjudgment mootness and to nullify that prejudice. The exercise of the discretion to vacate in any other setting not only does nothing to protect the losing party's interest in further review, but also deprives the prevailing party of the collateral benefits of his judgment and creates an incentive for the losing party deliberately to moot the case by compliance with the judgment—the very factors we identified in *Garde* as warranting a departure from the *Munsingwear* doctrine. *See* 848 F.2d at 1311.

In rejecting the Government's petition for rehearing and suggestion for rehearing *en banc* in this case, a majority of this court has already indicated that the United States has furnished no reason to revisit the merits of the panel's decision. That determination should be decisive in our consideration of the United States' motion to vacate.

The majority invokes a more expansive view of our discretion. It notes that the

question of Congress' power to compel legislative action by the Council members is "important" to the District's scheme of governance, and that answering the question requires us to confront an issue of constitutional law. These considerations, the majority concludes, counsel us to leave for another occasion final resolution of the underlying legal dispute.

In my view, the alleged importance and/or constitutional status of the issues resolved in the case cannot possibly be proper factors on which to base the exercise of the court's discretion to vacate, because they have nothing to do with the *reasons* that the court is vested with that power. In the absence of any conclusion that the *merits* of the panel decision should be reconsidered—a course that a majority of the full court has already *rejected*—the mere importance or constitutional status of the issues resolved does not justify relieving the United States of the collateral effects of the panel's judgment. Nor does the importance or constitutional status of the issues mitigate either the unfairness of depriving the Council members of *the benefits* of their victory or the incentive for post-judgment manipulation of our jurisdiction.

If anything, the importance and constitutional status of the issues only *aggravate* these concerns, as the facts of this case well illustrate. The Council members retain a substantial interest in the *preclusive effect* of the panel's decision precisely because the issues resolved in the case are important to the District's scheme of governance. *See Garde,* 848 F.2d at 1311 (emphasizing importance of "avoid[ing] any prejudice to appellees by possibly subjecting them to a relitigation of the same issues").[9] Enactment of Armstrong II may have mooted the controversy surrounding Armstrong I, but it by no means signalled Congress' renunciation of its right to coerce legislative action by the Council members in the future. *Cf.* 135 Cong.Rec. S11,103, S11,104 (daily ed. Sept. 14, 1989)

(statement of Sen. Armstrong) (expressing his astonishment with view "that Congress cannot use funding as a coercive device to require local policymakers to hew to some particular national standard" and suggesting that "this is a parliamentary formulation that we have used 50 times or 100 times or 1,000 times"). In expedited proceedings before the District Court, the Council members succeeded in obtaining a declaration of the invalidity of Armstrong Amendment I only hours before the law would have caused a complete shut-down of municipal services in the District—from public hospitals and public schools, to garbage collection, law enforcement and virtually all other services essential to the health, safety and welfare of the District's residents. The Council members and the citizens of the District should not be obliged to endure this uncertainty and disruption again.

The importance and constitutional status of the issues resolved in the case also directly contributed to the allegedly mooting episode—enactment of Armstrong Amendment II. Congress was perfectly aware of the constitutional challenge to its authority to compel legislative action by the Council. Rather than "let [the case] play out," Senator Armstrong introduced Armstrong Amendment II in order to "short-circuit" the ongoing legal controversy. 135 Cong. Rec. at S11,104. We are in no position, of course, to attribute this decision to the entire Congress or to assume that it was made in bad faith; indeed, a majority of the members of Congress may well have decided to go along with Armstrong Amendment II because they agreed that it was improper to coerce the Council members' votes. But whatever Congress' motives, the enactment of Armstrong Amendment II constitutes precisely the kind of postdecision compliance with the judgment that we indicated in *Garde* should *not* form the basis for vacatur.

9. As we recognized in *Garde,* moreover, the court's interest in preventing postjudgment manipulation of its jurisdiction survives the court's determination that the case does not come within the "voluntary cessation of illegal conduct" exception to mootness. *See id.* at 1309 & n. 5, 1311.

## IV.

This case was fully live through entry of judgment by the panel. Because the full court has determined that the United States is not entitled to further consideration of *the merits* at this stage of the appellate process, the alleged postjudgment mootness has not prejudiced the United States in any manner properly redressed by this court. I therefore dissent from the court's decision to grant the United States' motion.